871 P.2d 782

STATE of Hawai'i, Plaintiff–Appellee,

v.

Tony Lee McGRIFF, Defendant–
Appellant,

and

Rodney Alan Ingalls and Paul Anthony
Butler, Defendants.

No. 15867.

Supreme Court of Hawai'i.

April 11, 1994.

Wayne M. Rooney, on the briefs, Haleiwa, for defendant-appellant Tony Lee McGriff.

James M. Anderson, Deputy Pros. Atty., on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Defendant-appellant Tony Lee McGriff appeals his convictions of attempted theft in the first degree, in violation of Hawai'i Revised Statutes (HRS) §§ 708–830.5(1)[1] and 705–500,[2] and criminal property damage, in violation of HRS § 708–821(1)(a).[3] On appeal, McGriff primarily alleges violations of his constitutional right to confrontation and prosecutorial misconduct stemming from, *inter alia*, the admission of incriminatory hearsay[4] statements at trial.

We hold that admission of the subject testimony did not offend McGriff's right to confront his accuser because the declarant was unavailable and the statements fell within the Hawai'i Rules of Evidence (HRE) co-conspirator hearsay exception, Rule 803(a)(2)(C) (1985).[5] We also find no misconduct on the part of the prosecutor. Thus, we affirm the conviction.

## I. BACKGROUND

In the early morning hours of October 8, 1990, a fire completely gutted the "23rd Step" nightclub (nightclub or club) situated on the second floor of a building located at 274 Kuulei Road, Kailua. Fire units arrived

---

1. HRS § 708–830.5 provides:
 **Theft in the first degree.** (1) A person commits the offense of theft in the first degree if the person commits theft:
 (a) Of property or services, the value of which exceeds $20,000;
 (b) Of a firearm; or
 (c) Of dynamite or other explosive.
 (2) Theft in the first degree is a class B felony.
 HRS § 708–830.5 (Supp.1992).

2. HRS § 705–500 provides:
 **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if he:
 (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or
 (b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.
 (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
 (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.
 HRS § 705–500 (1985).

3. HRS § 708–821 provides:
 **Criminal property damage in the second degree.** (1) A person commits the offense of criminal property damage in the second degree if:
 (a) He intentionally damages property of another, without his consent, by the use of widely dangerous means[.]
 HRS § 708–821(1)(a) (1985).

4. Under the HRE, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." HRE 801(3) (1985). A "[s]tatement" is (A) an oral or written assertion, or (B) a nonverbal conduct of a person, if it is intended by the person as an assertion. HRE 801(1). The "[d]eclarant" is a person who makes a statement. HRE 801(2).

5. HRE 803 provides in relevant part:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 (a) Admissions.
 . . . .
 (2) Vicarious admissions. . . . (C) a co-conspirator of the party during the course and in furtherance of the conspiracy.
 HRE 803(a)(2)(C).

shortly after 2:30 a.m. and labored for nearly seven hours before the blaze was completely extinguished. The Honolulu Fire Department's (HFD) investigation revealed that the fire was incendiary in nature.

On October 26, 1990, McGriff, the manager of the nightclub, was charged in connection with the fire. The complaint alleged:

*Count I:* On or about the 1st day of October, 1990, to and including the 11th day of October, 1990, in the City and County of Honolulu, State of Hawaii, TONY LEE MCGRIFF and RODNEY ALAN INGALLS did intentionally engage in conduct which, under the circumstances as they believed them to be, constituted a substantial step in a course of conduct intended to culminate in their commission of the crime of Theft in the First Degree, by attempting to obtain or exert control over the property of Acceptance Insurance Company, the value of which exceeds Twenty Thousand Dollars ($20,000.00), by deception, with intent to deprive said Acceptance Insurance Company of the property, thereby committing the offense of Attempted Theft in the First Degree[.]

*Count II:* On or about the 8th day of October, 1990, in the City and County of Honolulu, State of Hawaii, TONY LEE MCGRIFF, RODNEY ALAN INGALLS, and ANTHONY BUTLER did intentionally damage property of Helen Ing, without her consent, by the use of widely dangerous means, thereby committing the offense of Criminal Property Damage in the Second Degree[.]

As evidenced by the complaint and its opening statement at McGriff's trial,[6] which commenced on September 23, 1991, the prosecution's theory of the case was that McGriff had orchestrated the blaze to collect fire insurance proceeds because the business was in financial crisis. In particular, the prosecution alleged that McGriff hired an acquaintance, Rodney Ingalls, to start the fire.

Helen Ing, the owner of the building in which the nightclub was situated, testified that she leased the nightclub to Ed Shine

from January 1, 1986 through December 31, 1990. Shine testified that in March 1990 he assigned his interest in the lease and sold his cabaret license, along with the club's fixtures and equipment, to "McGriff Liquors," a business owned by McGriff's mother, Jeannie McGriff, for $230,000.00. McGriff Liquors paid $65,000.00 down and agreed to pay the balance of $165,000.00 in monthly installments of $2,180.49. Thereafter, the nightclub continued to operate under McGriff's management.

Several witnesses indicated that although the nightclub did well for a few months under the new ownership, patronage waned shortly before the fire. For example, Michelle Puuoha, a bartender at the nightclub, testified that right before the fire, business had been "kind of slow" because the college students had gone back to classes and the Kaneohe marines had left for Kuwait. As a result, McGriff told the club employees that he was forced to reduce wages and cancel their medical coverage. Testimony from Ing, Shine, Carol Cobb (the bar manager), and Kelly Martin (waitress and part-time bartender at the club) similarly indicated that the nightclub was in dire financial straits preceding the fire on October 8, 1990.

With regard to the origin of the fire, Lloyd Rodgers, a HFD captain, was qualified by the court as an expert in fire investigation. Rodgers testified that he arrived on the scene at approximately 4:30 a.m. to determine the origin and cause of the fire. A witness indicated the fire was precipitated by two explosions. Rodgers concluded the fire was intentionally set because: (1) there was an odor of gasoline at the scene; (2) the burn pattern indicated a liquid accelerant was used to ignite the fire; (3) the witness's description of the explosions indicated gasoline vapors were present and the accelerant was poured through the establishment; and (4) the difficulty in extinguishing the flames was suggestive of an accelerant fire.

The prosecution also examined various witnesses to establish that McGriff planned the

6. On February 11, 1991, the circuit court granted the prosecution's motion to sever the trial of the three defendants.

fire with the intent to obtain insurance proceeds and encouraged and aided Ingalls to actually perform the deed. In particular, Lisa Donaldson (who had dated and lived with McGriff for a short time) testified that in November or December 1990, McGriff told her that "he paid Rod Ingalls $2,000 to torch the [club], and that [Ingalls] was supposed to keep his mouth shut." According to Donaldson, McGriff was to meet Ingalls in Seattle later to collect an additional $8,000.00, which McGriff would obtain from the fire insurance proceeds. Donaldson also recalled that McGriff told her he wanted Ingalls to burn down the club because "other clubs were trying to put him out of business[.]" [7] Additionally, Donaldson testified that a few days before the fire, "[she] caught ... Ingalls coming out of the club [with a set of keys,] and it looked very suspicious because no one else was supposed to have keys to it." Donaldson said that McGriff later told her not to "mention anything about the keys" if she was "subpoenaed to court[.]"

Puuoha also testified that only McGriff and the bar manager, Cobb, had sets of keys to the club, and that on the morning after the fire, she found a set of keys outside the door to the club's kitchen entrance, which unlocked that door's lock and deadbolt. Although she did not know to whom the keys belonged, she explained that she knew "[Cobb] had her keys with her because she had closed th[e] night [before the fire]." Cobb, in turn, testified that she was present when Puuoha found the keys at the back kitchen door and she (Cobb) recognized that the keys belonged to McGriff. Cobb further stated that McGriff told her he had lost his keys about three or four days before the fire.

Martin testified that she lived in McGriff's house near the time of the fire. She stated that on the day before the fire, she overheard McGriff tell Cobb that "he wanted the bar closed at 12:00 and everybody gone." Martin related that it was unusual for McGriff to close the club without first waiting to see if business was slow. She further testified that, on the same day, she drove McGriff to

the club, and he returned with his briefcase full of pictures of his children and other personal items from his office.

The prosecution also called co-defendants Ingalls and Butler as witnesses. The issues on this appeal relate predominantly to the prosecutor's examination of Butler and attempted examination of Ingalls at trial.

On September 25, 1991, Ingalls's attorney, Seth Thompson, appeared in court to quash the trial subpoena served on Ingalls. Thompson indicated that Ingalls had been convicted in his severed trial and was awaiting sentencing. Ingalls had been acquitted on Count I (attempted first degree theft) and convicted of Count II (second degree criminal property damage). Nonetheless, Thompson represented that Ingalls intended to appeal his conviction based on the trial court's purported erroneous denial of a motion to suppress a recorded statement made by him to a detective. Thus, based on the possibility that Ingalls would be successful on appeal and then retried, Thompson explained that Ingalls would assert his fifth amendment privilege against self-incrimination if called to testify as a witness in McGriff's trial. The circuit court denied the motion to quash, ruling that Ingalls had already waived his fifth amendment right when he knowingly, albeit reluctantly, chose to testify in his own trial after his recorded statement had been admitted in that trial.

On September 26, 1991, when the prosecution called Ingalls as its next witness, McGriff's counsel requested that Ingalls be called to the stand outside the presence of the jury because Ingalls had indicated that he would insist on asserting his fifth amendment privilege. The court agreed after reminding counsel that it had already ruled on the privilege issue. Ingalls then took the stand outside the presence of the jury and invoked the fifth amendment as anticipated, despite the court's warning that he could not legally refuse to testify. Unwilling to heed the court's ruling and admonition that he could be held in contempt, Ingalls was excused.

---

7. On cross-examination, however, Donaldson testified that in a later meeting, McGriff told her he had lied about the fire, and "he just held on to my wrist and squeezed it real tight and he says now, you know I could get to you[.]"

When the prosecution indicated that it would next call Butler to the stand, McGriff objected on the grounds of hearsay and the right to confrontation in anticipation of any questions attempting to elicit from Butler statements made by Ingalls. The prosecution responded that Ingalls's statements were admissible as admissions of a co-conspirator. The court found as a preliminary matter that Ingalls's statements were made in the course and furtherance of a conspiracy with McGriff and allowed the testimony.

Butler testified as follows: Ingalls was staying with him during the weeks before the fire. Ingalls approached Butler about four or five days before the fire and said "[McGriff] wanted him [ (Ingalls) ] to burn down the [nightclub]" in return for $1,000.00 and further payment "after the settlement[.]" On the day preceding the fire, Butler and Ingalls drove to the nightclub with five to eight white five-gallon plastic buckets full of gasoline.[8] Ingalls carried the buckets upstairs to the club and hid them inside while Butler waited in the car. The following day, October 8, 1990, both Butler and Ingalls returned to the nightclub around 12:30 or 1:00 a.m. Ingalls told Butler "he was going to light the fire" while Butler again remained in the car. Butler recalled that Ingalls entered the club with keys he (Ingalls) had gotten from McGriff. After Butler heard a "loud rumble and a major explosion[,]" Ingalls returned to the car "pretty shook up" and said "[l]et's go." Ingalls told Butler he had dumped the gasoline throughout the establishment and ignited it with a match.

Butler further stated that sometime after October 8, 1990, Ingalls showed him "an envelope with assorted 20's ... which to me looked like a large sum of cash and [Ingalls] said it was a thousand dollars." Butler also testified that on the day they "were incarcerated[,]" Ingalls was planning to leave to meet McGriff in Washington "to settle their financial thing." Butler admitted on cross-examination that he was waiting to be sentenced for criminal property damage because of the fire and hoped his cooperation in testifying would bear favorably on his sentence. But-ler stated, however, that he had never discussed or entered into any type of plea agreement with the prosecution.

On September 30, 1991, the prosecution sought to call Detective Reginald Kealoha as a witness to testify to the substance of a recorded statement taken from Ingalls during the investigation of the fire. McGriff objected on the grounds that Ingalls's statements were "made to a police officer, and there is no indication as to its reliability but for the assertion by the State that it's against Rodney Ingalls's penal interest." Although the court overruled McGriff's objection, McGriff continued to argue that the statement made to Kealoha was unreliable because Ingalls allegedly testified inconsistently with the statement at his own trial. After hearing further argument, the court allowed Kealoha to testify.

Kealoha testified that he had taken a voluntary statement from Ingalls. However, before the statement was introduced into evidence, the court ordered a recess. When it reconvened, the court reversed itself and ruled that Kealoha could not testify to Ingalls's statement. At that point, McGriff moved for a mistrial based on the testimony that had already been elicited from Kealoha. The court denied the motion, reasoning that a cautionary instruction was sufficient to cure any prejudice McGriff might have suffered.

In his defense, McGriff denied any knowledge of or participation in the destruction of the nightclub. He testified that he had put so much time and effort into making the club successful that "[y]ou would have had to kill me to go ahead and make it to where I had to leave that club." Both McGriff and Jeannie McGriff testified that, although the club was struggling, they had remained optimistic. The defense also indicated that, because Jeannie McGriff owned the club and was the beneficiary of the insurance policy, McGriff had nothing to gain if the club burnt down.

On October 9, 1991, the jury returned guilty verdicts on both counts. McGriff was sentenced concurrently to ten and five years of incarceration for counts I and II, respec-

---

**8.** Police officer Tasman McKee testified that he recovered from the scene of the fire the remains of seven charred and melted white plastic buckets which had fused together.

tively, with mandatory minimums for both as a repeat offender. This timely appeal followed.

## II. *DISCUSSION*

On appeal, McGriff claims error in connection with the following: (1) Butler's testimony recalling statements made to him by Ingalls; (2) Detective Kealoha's testimony that Ingalls made a statement to him in the course of investigating the fire; and (3) the prosecution's calling of Ingalls to the stand, coupled with Ingalls's invocation of the fifth amendment. McGriff also alleges prosecutorial misconduct in connection with the introduction or attempted introduction of evidence from Butler, Kealoha, and Ingalls.

### A. *Butler's Testimony*

 McGriff's primary argument on appeal is that his constitutional rights to confront his accuser under the United States and Hawai'i constitutions were violated when the trial court allowed the prosecution to elicit from Butler out-of-court incriminatory statements made by Ingalls. McGriff particularly protests his resulting inability to cross-examine Ingalls regarding the statements. Initially, we note that McGriff's Second Amended Brief violates Hawai'i Rules of Appellate Procedure (HRAP) 28(b)(4)(A) in that he failed to quote "the grounds urged at the trial for the objection and the full substance of the evidence admitted[.]" Therefore, we are not obligated to consider the "points of error" purportedly raised on appeal. *See* HRAP 28(b)(4) ("[p]oints [of error] not presented in accordance with this section will be disregarded, except that the court, at its option may notice a plain error not presented"); *Airgo, Inc. v. Horizon Cargo Transport, Inc.,* 66 Haw. 590, 670 P.2d 1277 (1983); *Johnson v. Robert's Hawai'i Tour, Inc.,* 4 Haw.App. 175, 180, 664 P.2d 262, 266–67 (1983). However, if we should determine that Butler's testimony in this case contravened the confrontation clauses of the United States or Hawai'i constitutions, the admission of such testimony would be considered plain error. We will therefore examine whether the admission of Butler's testimony relating out-of-court statements made by Ingalls violated article I, § 14 of the Hawai'i Constitution or the sixth amendment to the United States Constitution. HRAP 28(b)(4); *see also State v. Grindles,* 70 Haw. 528, 530, 777 P.2d 1187, 1189 (1989) (this court may *sua sponte* notice plain errors affecting an accused's substantial rights).

### 1. **The Confrontation Clause**

 The confrontation clause in the sixth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, *Pointer v. Texas,* 380 U.S. 400, 403–05, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923 (1965); *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974), provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The confrontation clause of the Hawai'i Constitution is virtually identical. Haw. Const. art I, § 14 (1978); *State v. Rodrigues,* 7 Haw.App. 80, 83, 742 P.2d 986, 988 (1987). This court has acknowledged that the primary purpose of the sixth amendment confrontation clause

> "was to prevent depositions or *ex parte* affidavits ... being used against the [accused] in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection ... of the witness, but of compelling [the witness] to stand face to face with the [jurors] in order that they [might] look at him [or her], and judge by [the witness's] demeanor upon the stand and the manner in which he [or she] gives his [or her] testimony whether [the witness] is worthy of belief."

*State v. Adrian,* 51 Haw. 125, 132, 453 P.2d 221, 225 (1969) (quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895)). Thus, chief among the interests secured by the confrontation clause is the right to cross-examine one's accuser. *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980) (citation omitted).

 Although recognizing the fundamental nature of the right, the United States Supreme Court has refused a strict, literal

application of the sixth amendment confrontation clause:

> While a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, this Court has rejected that view as "unintended and too extreme." Rather, we have attempted to harmonize the goal of the Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, which may require consideration of out-of-court statements.

*Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987) (internal citation omitted). Similarly, rather than imposing a complete bar to such out-of-court statements, we have acknowledged that

> the confrontation clause restricts the range of admissible hearsay in two ways. First, the prosecution must either produce, or demonstrate the unavailability of, a declarant whose statement it wishes to use against a defendant. Second, upon a showing that the witness is unavailable, only statements that bear adequate indicia of reliability are admissible.

*State v. Ortiz,* 74 Haw. 343, 361, 845 P.2d 547, 555–56, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993) (citing *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538) (other citations omitted).

■ With regard to the first requirement, we have remained resolute that under the confrontation clause of the Hawai'i Constitution, "[a] showing of the declarant's unavailability is necessary to promote the integrity of the fact finding process and to ensure fairness to defendants." *Ortiz,* 74 Haw. at 362, 845 P.2d at 556. In so holding, we have parted ways with the United States Supreme Court which has held that the sixth amendment confrontation clause does not necessitate a showing of unavailability for evidence falling within certain hearsay exceptions.

*See United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (statements of a non-testifying co-conspirator may be introduced against the defendant regardless of the declarant's availability at trial); *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (unavailability not required for excited utterance exception). Indeed, in *White,* the Supreme Court stated that an "unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." *Id.* —— U.S. at ——, 112 S.Ct. at 741.

■ With regard to the second requirement, "[r]eliability is shown 'if the evidence falls within a firmly rooted hearsay exception' or 'upon a showing of particularized guarantees of trustworthiness.'" *Ortiz,* 74 Haw. at 361, 845 P.2d at 556 (citing *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538). One such "'firmly rooted hearsay exception'" is the co-conspirator exception. *Bourjaily,* 483 U.S. at 183, 107 S.Ct. at 2782; *see Rodrigues,* 7 Haw.App. at 85 n. 5, 742 P.2d 989 n. 5.

Thus, in this case, the dispositive issues with regard to the propriety of Butler's testimony are whether: (1) Ingalls was "unavailable" to testify; and (2) Ingalls's statements qualify as those of a co-conspirator made in the course and in furtherance of a conspiracy. If both questions are answered in the affirmative, McGriff's rights to confront Ingalls (his accuser) under the United States and Hawai'i constitutions were not impaired.

There is no dispute in this case that Ingalls was unavailable to testify. Clearly, Ingalls's refusal to testify, despite the court's order to do so, made him unavailable under HRE 804(a)(2).[9] There also appears to be no dispute that Ingalls's statements as testified to by Butler constituted "hearsay."[10] Accordingly, the prosecution's attempt to introduce such evidence triggered the hearsay rule. However, the prosecution argues on appeal,

---

9. HRE 804 (1985) provides in pertinent part:
 **Hearsay exceptions; declarant unavailable.**
 (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:
 . . . .

(2) Persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so[.]

10. *See supra* note 4.

as it did at trial, that Ingalls's statements were admissible under the co-conspirator (vicarious admissions) exception to the hearsay rule, specifically, HRE 803.

## 2. HRE 803

HRE 803 excludes from the operation of the hearsay rule "[a] statement that is offered against a party and was uttered by ... a co-conspirator of the party · during the course and in furtherance of the conspiracy." HRE 803(a)(2)(C) (1985).[11] McGriff objected at trial that the co-conspirator exception did not apply because: (1) McGriff had not been charged with conspiracy; and (2) in any event, the existence of a conspiracy had not been shown.

█ With regard to McGriff's first contention, it is clear that a defendant need not be charged with conspiracy to admit a statement against him or her under the co-conspirator hearsay exception. *State v. Pulawa,* 58 Haw. 377, 569 P.2d 900 (1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978); *see also Roberts, supra,* (application of co-conspirator exception approved in case where no conspiracy charged). As to McGriff's second contention, we previously noted that the circuit court admitted Butler's testimony because it had made a preliminary determination of fact that Ingalls's statements were made in the course and furtherance of a conspiracy with McGriff to burn down the nightclub. On·appeal, McGriff essentially urges us to hold that the circuit court erred in making that determination.

█ Before admitting a co-conspirator's statement over objection that it does not qualify under HRE 803(a)(2)(C), the trial court must be satisfied that the statement actually falls within the definition of that rule; "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily,* 483 U.S. at 175, 107 S.Ct. at 2778; *accord State v. Yoshino,* 45 Haw. 206, 214–15, 364 P.2d 638, 644 (1961). "Preliminary questions con-

cerning the ... admissibility of evidence shall be determined by the court[.]" HRE 104(a) (1985). Where the preliminary facts necessary for the admissibility of evidence are disputed, the offering party has the burden to prove facts supporting admission by a preponderance of the evidence. *See Bourjaily,* 483 U.S. at 176, 107 S.Ct. at 2779.

█ On appeal, the trial court's determination of preliminary factual issues concerning the admission of evidence will be upheld unless clearly erroneous. *See id.* at 181, 107 S.Ct. at 2781. "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Hawaii's Thousand Friends v. City and County of Honolulu,* 75 Haw. 237, 248, 858 P.2d 726, 732 (1993) (citation omitted) (internal brackets omitted).

█ In the present case, there was substantial evidence to support the trial court's finding that Ingalls's statements were made in the course and furtherance of a conspiracy with McGriff to incinerate the nightclub in an attempt to illegally obtain insurance proceeds. Specifically, the court expressly based its determination on the record and evidence adduced at trial as of the time of its ruling, relying particularly on the testimony of Donaldson.

As previously noted, Donaldson testified that McGriff told her "he paid Rod Ingalls $2,000 to torch the [club], and that [Ingalls] was supposed to keep his mouth shut" and that Ingalls was to meet McGriff later in Seattle to collect an additional $8,000.00, which McGriff was to obtain from the fire insurance proceeds.

█ Further, at the time of the trial court's ruling, the record in this case contained the recorded statement given by Butler to Detective Kealoha during the investigation of the fire. Butler's recorded statement substantially paralleled the testimony he gave at McGriff's trial following the trial

---

11. HRE 803(a)(2)(C) is substantially identical to the co-conspirator hearsay exception embodied in *Federal Rule of Evidence* 801(d)(2)(E). How-

ever, unlike Hawaiʻi's confrontation clause, the availability of the declarant is immaterial for purposes of HRE 803 exceptions.

court's determination of the existence of a conspiracy. In particular, Butler revealed in his statement to Kealoha, *inter alia*, that: (1) Ingalls told him he was going to burn down the nightclub with gasoline because McGriff had offered him money to do it; (2) he accompanied Ingalls on two separate occasions to take gasoline to the club and later to start the fire at the club; and (3) Ingalls gained entrance into the club with keys that McGriff had given him. The court properly considered Butler's recorded statement in deciding the foundational requirement that a conspiracy existed. In determining the preliminary facts, HRE 104(a) expressly provides that the trial court "is not bound by the rules of evidence except those with respect to privileges." Indeed, the court may consider the very evidence sought to be admitted. In other words, "a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Bourjaily*, 483 U.S. at 180, 107 S.Ct. at 2781.

Moreover, the transcript of Ingalls's statement to Kealoha was also a part of the record and could have been subject to consideration by the court on the preliminary issue. In that statement, Ingalls admitted, *inter alia*, that: (1) McGriff offered him $10,000.00 to burn down the nightclub; (2) he and McGriff planned how to accomplish that deed together; (3) the two decided to use gasoline; (4) McGriff gave him the keys to gain entrance to the club to start the fire; and (5) McGriff told him he would close the club early on October 7 because it would be a "good time . . . to start the [club] on fire[.]"

Thus, Butler's and Ingalls's statements corroborated each other, and Donaldson's testimony substantially corroborated both. Upon review of the evidence considered by the circuit court in determining the preliminary facts necessary for the admission of Butler's testimony regarding Ingalls's hearsay statements, we hold that the circuit court

was not clearly erroneous in finding that Ingalls's statements were made in the course and furtherance of a conspiracy with McGriff to illegally burn down the nightclub for profit.

Accordingly, the admission of Butler's testimony concerning incriminatory out-of-court statements made against McGriff did not violate McGriff's rights to confront his accuser under the United States or Hawai'i constitutions.[12]

### B. *Detective Kealoha's Testimony*

Next, McGriff argues that he was prejudicially harmed by the court's "admission" of certain "information" from Kealoha regarding Ingalls. Essentially, McGriff complains that Kealoha's reference to a voluntary statement given by Ingalls gives rise to an impression that he was associated with Ingalls, "the admitted arsonist." To the extent these arguments are comprehensible, they are identical to those presented by McGriff in asserting that the prosecutor committed misconduct in eliciting the same "information." As discussed below, we hold that Kealoha's testimony and Ingalls's refusal to testify did not result in substantial prejudice to McGriff's right to a fair trial and we therefore reject these claims.

### C. *Prosecutorial Misconduct*

 McGriff alleges several instances of prosecutorial misconduct purportedly necessitating reversal of his conviction. Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial. *State v. Pemberton*, 71 Haw. 466, 476, 796 P.2d 80, 85 (1990) (citing *State v. Sugimoto*, 62 Haw. 259, 614 P.2d 386 (1980)); *State v. Apao*, 59 Haw. 625, 586 P.2d 250 (1978);[13] *State v. Johnson*, 3 Haw.App. 472, 484, 653 P.2d 428, 436 (1982) (citations omitted).

---

12. McGriff's brief also lists as error the "hearsay testimony of Paul Butler[,] as given by Lisa Donaldson[,]" although he fails to cite to the record or make an argument on the point. Because the prosecution correctly notes that no such testimony was ever given, there can be no "error."

13. Although the court in *Apao* described the prejudice necessary to grant a motion for mistrial as "substantial," we believe the adjective is superfluous and redundant.

First, although not precisely enunciated in his brief, McGriff evidently argues that the prosecutor committed misconduct in eliciting hearsay testimony from Butler which deprived McGriff of his constitutional right to confrontation. Based on the discussion above, this argument is without merit.

■■■■■ Second, McGriff claims that the prosecutor committed misconduct resulting in substantial prejudice by calling Ingalls to the stand knowing that Ingalls would invoke his fifth amendment privilege against self-incrimination. We find this argument wholly without merit for two reasons. First, by the time the prosecution called Ingalls as a witness, the trial court had already ruled that Ingalls had waived his fifth amendment right and could not refuse to testify. Accordingly, the prosecutor was justified in calling Ingalls to the stand. Second, McGriff could not possibly have suffered prejudice by such conduct because the record clearly reflects that Ingalls was called to the stand, invoked the privilege (despite the court's ruling), and was excused, all in the absence of the jury.

Third, McGriff alleges misconduct by the prosecutor in eliciting testimony from Detective Kealoha that Ingalls gave a statement to him in the course of Kealoha's investigation of the fire. McGriff maintains that, based on that testimony, the circuit court erred in denying his motion for mistrial.

As noted above, the court initially ruled that Kealoha could testify to the substance of Ingalls's statements. Having been sworn, Detective Kealoha testified as follows:

Q: Detective, in October of 1990, were you assigned to investigate a case involving the 23rd Step Nightclub in Kailua at 274 Kuulei Road and involving Tony McGriff?

A: Yes.

Q: In the course of your investigation of this case in October of 1990, did you speak with or obtain a statement from Rodney Ingalls?

A: Yes, sir.

Q: And did this take place in [sic] October 15, 1990?

A: Yes, sir.

Q: And on this occasion, when you spoke with Rodney Ingalls, prior to actually interviewing him, did you warn him of his constitutional rights?

A: Yes, sir.

 * * * * * *

Q: Did you ask him whether or not he would like to tell you what happened?

A: Yes, sir.

Q: What did he say?

A: He stated he did want to give me a statement.

The prosecution then offered Ingalls's statement into evidence. The court, however, ordered a recess to reconsider the appropriateness of admitting the statement.

■■■■ When the court reconvened, it entertained further argument on the admissibility of Ingalls's statement and then stated:

At this time I'm going to respectfully reverse the Court's earlier ruling ... in this particular situation, although there is unavailability, [I] cannot say that there is the so-called reliability and corroboration that seems to be required; therefore, I will not allow any further testimony by Detective Kealoha regarding Mr. Ingalls's statements.

McGriff then moved, unsuccessfully, for a mistrial based on the testimony that had already been elicited from Kealoha. When the jury returned, the court advised it:

Ladies and gentlemen of the jury, this court has struck Detective Reginald Kealoha's testimony from the record, and you are respectfully instructed to disregard any and all of his testimony. It should play no weight whatsoever in your deliberation. It is not part of the evidence in this case.

McGriff alleges on appeal that

[t]he elicitation of information from detective Kealoha was in error in that it informed the jury that [Kealoha] had (or the prosecution had) information regarding the guilt of the defendant. The subsequent non-testifying of Detective Kealoha thus informed the jury that the defense had somehow kept this damaging evidence out of their knowledge. The jury could not have been left with any other impression

but that ... the defendant was hiding something and was obviously guilty.

In spite of McGriff's argument, we fail to perceive any misconduct on the part of the prosecutor. The circuit court had ruled that the subject testimony was admissible, and the prosecutor then acted appropriately to elicit the same. The prosecutor did not attempt, directly or indirectly, to introduce inadmissible evidence. *Cf. Pemberton,* 71 Haw. 466, 796 P.2d 80 (premeditated pattern of improper questioning designed to alert the jury to existence of inadmissible evidence).

 Even assuming *arguendo* that the prosecutor behaved improperly, the trial court has the discretion to determine whether such action mandates a mistrial or whether it may simply be cured by a cautionary instruction. *See State v. Kahinu,* 53 Haw. 536, 549–50, 498 P.2d 635, 644 (1972), *cert. denied,* 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973). Generally, "a prosecutor's improper remarks are considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." *Pemberton,* 71 Haw. at 475, 796 P.2d at 87 (citations and internal quotation marks omitted). Although the jury may have formed some impression based on Kealoha's testimony that Ingalls gave a statement, the substance of the statement was never adduced. Consequently, the trial court acted well within its discretion in concluding that Kealoha's testimony did not generate the kind of insurmountable prejudice that could not be cured by a cautionary instruction.

Furthermore, we conclude that the curative instruction given by the court was adequate under the circumstances.[14]

### D. *Sufficiency of the Evidence*

Finally, McGriff argues that there was insufficient evidence to support the trial court's findings of fact and conclusions of law. McGriff's argument on this point of error is somewhat ambiguous and incoherent; however, we assume that a portion of this argument is related to the court's preliminary finding that a conspiracy existed. To the extent that it is, we reject it based on our previous discussion. McGriff also seems to argue that, without the evidence that he considers erroneously admitted, there is insufficient evidence to support his conviction. Despite the fact that this argument is not enumerated in McGriff's points of error or questions presented and having held that each of McGriff's objections was unfounded, we reject the argument because we hold that there was substantial evidence to support McGriff's convictions on both counts.

### III. *CONCLUSION*

Based on the foregoing, the judgment of conviction is affirmed.

---

**14.** McGriff's apparent argument that the prosecutor improperly attempted to introduce (through Kealoha) Ingalls's testimony from his separate trial is meritless; such testimony was rejected by the court and the record reveals no attempt by the prosecutor to circumvent that ruling.