153 P.3d 464

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Emanuelu TUNOA, aka Elu, Defendant–Appellant.**

**No. 27756.**

Intermediate Court of Appeals of Hawai'i.

March 6, 2007.

Linda C.R. Jameson, on the briefs, for Defendant–Appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

In this murder case, which arose out of the shotgun slaying of Tuputala Esau (Tupu), Emanuelu Tunoa (Defendant or Elu) appeals the January 10, 2006 judgment of the Circuit Court of the First Circuit (circuit court) [1] that convicted him of murder in the second degree (count I) and use of a firearm in the commission of the murder (count V). On appeal, Defendant complains of various instances of purported prosecutorial misconduct, including the use of the "red herring" analogy in argument and the presence of the Prosecuting Attorney in the gallery during part of the trial. We affirm.

## I. Background.

Defendant was charged via complaint with murder in the second degree (count I), place to keep loaded firearm (count II), felon in possession of ammunition (count III), felon in possession of a firearm (count IV), and use of a firearm in the commission of the murder (count V).

---

1. The Honorable Karl K. Sakamoto presided.

During a hearing on various pretrial motions held just before jury selection, Defendant agreed to and signed a stipulation that at the time of the homicide, he (1) had a prior felony conviction and (2) lacked a permit to own or carry a firearm. The stipulation was filed in the court record.

During its general *voir dire*, the circuit court instructed the jury panel that

in deciding this case, you must consider only the evidence which has been presented to you and such inferences that are justified by your reason and common sense. You must not be influenced by pity for the defendant or passion or prejudice against the defendant. In other words, you're not here today to decide whether Mr. Tunoa is a good person or a bad person. You're here to decide whether, based on the evidence presented, the State has proven the crimes charged beyond a reasonable doubt. You must do this objectively. You must do this dispassionately.

Then the circuit court queried,

Is there anyone here who cannot follow this rule?

(No response)

As an introduction to his general *voir dire,* the deputy prosecuting attorney (DPA) told the jury panel that "I am the prosecutor in this case. And you'll notice that I don't have anybody sitting next to me at counsel table, and that's because as the prosecutor, I represent the people of the State of Hawaii in this case." Defendant did not object to this particular comment.

After the jury was selected and excused for the nonce, some other matters *in limine* were discussed. During the discussion, the circuit court questioned whether the morgue photographs to be shown to the jury had to be in color. Picking up on that concern, defense counsel asked that all such photographs be changed to black and white. The circuit court so ordered, over objection by the DPA.

Just before opening statements, the circuit court gave the jury some general instructions. Among them were the following:

From time to time during the trial, I will be called upon to make rulings of law on motions or objections that are made. Please do not conclude from any of my rulings that I have any opinions on the merits of this case or favor one side over the other. If you hear me sustain an objection to a question being asked by [sic] a witness, that means I will not permit the question to be answered. You should not speculate on what that answer is and not consider that answer. You should also not draw any conclusion from the question that was asked itself.

. . . .

And again, evidence comes by way of testimony, by witnesses after they have taken an oath to tell the truth, and from exhibits that have been received by the court for your consideration.

The State's first witness was the evidence specialist who took the morgue photographs. The DPA asked,

Q. And now, again, those photographs, do they represent the way that [Tupu] looked on—this was done on March 31st, 2003?

A. Yes.

Q. And the photos are in black and white but—

A. Yes.

Q. —he wasn't black and white when you—

A. Well, the photos I took were in color.

Defense counsel objected, and at bench reminded the circuit court that

you specifically instructed counsel to change the photographs to black and white. There's no reason to have told the jury, oh, the suggestion being they're so horrendous or they're so inflammatory that I had to have them changed to black and white, having it said specifically they were previously in color.

The circuit court sustained, but nevertheless ruled, over defense counsel's reiterated objection, that "[t]he questions themselves are not prejudicial, but they're not relevant. So he'll just move on."

Four eyewitnesses, each of whom was either related to or a friend—or at least a close

acquaintance—of both Defendant and Tupu, testified that on the evening of March 28, 2003, upwards of twenty young people gathered on the Leokāne Street bridge in Waipahu to drink beer. There, as the party wore on into the wee hours of the next day, Defendant shot Tupu several times at point-blank range with a twelve-gauge, pump-action, sawed-off shotgun. Defendant rode away from the scene in his car, driven by someone else. Tupu was dead on arrival at the hospital. One of the eyewitnesses close by remembered seeing Defendant pop the trunk of his car, take out a shotgun he had shown off on other occasions, point it at Tupu and say, "where my money stay?" That witness heard Defendant's brother plead, "No, Elu, no, Elu, put the gun away." But then, there was "[j]ust one big flash." None of the eyewitnesses saw Tupu take any action, aggressive or otherwise, towards Defendant. None of them saw Tupu with a weapon that night. All Tupu had in his hand when he died was a Bud Light.

Several of the eyewitnesses and a couple of other witnesses remembered a fight between Defendant and Tupu that took place about a month before the homicide. Apparently, Tupu owed Defendant $140 but refused to pay. To settle the dispute, they agreed to fight. After some preliminary posing by both men, Defendant lunged in to attack but was met by a straight right to the face. Defendant dropped to the ground unconscious, whereupon Tupu stepped over him and punched him four more times for good measure. Defendant never did get his money back.

The chief medical examiner conducted the autopsy. She found three shotgun wounds. The first shot, fired from four to seven feet away, entered the right lower side of Tupu's chest, causing major damage to his heart and liver. The second shot, fired from one to three feet away, went through Tupu's left cheek, severely lacerating his brain and blowing his skull apart. The third shot, also from one to three feet away, went into Tupu's right upper back, fractured his ribs and caused catastrophic damage to his right lung. Each wound, in and of itself, would have been fatal. The medical examiner

found alcohol and crystal methamphetamine in Tupu's blood.

After the State rested, the DPA broached the subject of a motion for judgment of acquittal:

> [DPA]: J.A.
>
> [DEFENSE COUNSEL]: Oh, a motion for J.A. I mean construing the facts in the light most favorable to the State which is the standard,
>
> THE COURT: The court will deny the motion. Anything else before your case begins tomorrow at nine?
>
> [DEFENSE COUNSEL]: No.
>
> THE COURT: Thank you, counsel. See you tomorrow.
>
> (COURT ADJOURNED)

However, the next day brought the DPA's realization that he had forgotten to read the stipulation regarding Defendant's prior felony conviction to the jury. He proposed to the circuit court that he do so before the start of Defendant's case. But defense counsel noted that the State had rested, and suggested instead that the circuit court read the stipulation along with its general jury instructions. The DPA then requested that he be allowed to reopen the State's case in order to present the stipulation to the jury.

The circuit court noted, however, that under *State v. Kwak*, 80 Hawai'i 297, 304–05, 909 P.2d 1112, 1119–20 (1995) (abuse of discretion for district court to allow State to reopen its case to establish venue after defendant had moved for judgment of acquittal for lack of proof thereof), "it's an abuse of discretion if I reopen the case to allow introduction of the evidence." The DPA attempted to distinguish his case and the *Kwak* case, but the circuit court was skeptical, "so I'm going to take it under advisement to give both counsel an opportunity to look at those cases." At that point, defense counsel, realizing that the stipulation was the linchpin of the felon-in-possession charges, opposed reopening of the State's case and reiterated as to counts III and IV his previously-denied motion for judgment of acquittal. The circuit court again stated, "I'll take it under advisement to allow both counsel to look at the case law."

Defendant's case comprised the testimony of his younger brother, Patolo Tunoa Scanlan, nicknamed Little Kolo. Little Kolo related that he was a friend of Tupu. He claimed that Defendant was also a friend of Tupu. He remembered the prior fight between the two, which he described just as the State's witnesses had, except that it happened about a year instead of a month before the homicide. Little Kolo maintained that Defendant and his family harbored no ill will towards Tupu as a result. In fact, on a couple of occasions after the fight, Defendant and Tupu had hung out and gotten drunk together at the bridge.

Little Kolo arrived at the bridge at 5:30 or 6:00 the night of the homicide. Defendant was already there, drinking Heinekens. Defendant was "[n]ormal, friendly, sociable." He did not have a weapon of any kind. When asked how much Defendant had to drink that night, Little Kolo replied, "Roughly about two cases, a lot." From experience, Little Kolo knew that when Defendant drinks that much, he passes out and does not remember anything afterward, and that was in fact what happened that night. Defendant was passed out in his car when Tupu got to the bridge, and stayed that way through the shooting. Little Kolo heard, but did not see, the shooting, and jumped at the sound into Defendant's car with a friend, who drove Little Kolo and his unconscious brother away from the bridge. But Little Kolo did see an unidentified man kick Tupu when he was down.

At the beginning of his cross-examination of Little Kolo, the DPA asked,

Q. Now, on March 29th, 2003, you knew your brother had been convicted of a felony before, right?

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Sustained.

[DPA]: Your Honor, may we approach?

THE COURT: Yes.

(THE FOLLOWING PROCEEDINGS WERE HELD AT THE BENCH)

[DEFENSE COUNSEL]: Your Honor, I'm moving for a mistrial. Counsel—

[DPA]: No.

[DEFENSE COUNSEL]: Counsel—

[DPA]: I asked to approach. It's my—

[DEFENSE COUNSEL]: Counsel should not have said that. He said—

[DPA]: You have to keep your voice down.

[DEFENSE COUNSEL]: This is outrageous. You knew exactly what the position was in State versus Kwak. In the presence of this jury he intentionally asked this question when he failed to establish Counts III and IV.

[DPA]: [Defense counsel] agreed to it and it's in the record.

[DEFENSE COUNSEL]: You violated the court order.

[DPA]: Shut up. Let me respond.

THE COURT: Wait, wait.

[DEFENSE COUNSEL]: You told me to shut up?

THE COURT: Let him make his record.

[DPA]: [Defense counsel] agreed to the stipulation for the prior felony and now he's not agreeing to it. He stipulated to it so the purpose for this stipulation is so I could get that in without having to call the witnesses. I could have called the witnesses that have knowledge so I can ask this question.

THE COURT: So basically, you're asking the court to make its ruling on the judgment of acquittal at that time, make that ruling now?

[DPA]: No, I'm not.

THE COURT: You're trying to introduce evidence regarding the prior felony at this point. There was an issue of whether or not I would sustain a judgment of acquittal on insufficiency of the evidence at that time, but I haven't ruled on that. I said I'm going to reserve the ruling. Now you're trying to introduce the evidence so now I have to make a ruling.

[DPA]: I'll withdraw the question.

[DEFENSE COUNSEL]: It's too late. It's too late. He can't—he can't withdraw the question. The question itself was sufficient. I'm moving for—

[DPA]: The witness has not answered.

THE COURT: Now you're raising the issue of mistrial. The issue of mistrial is denied.

[DEFENSE COUNSEL]: I'm asking the court to dismiss Counts III and IV because counsel has improperly—

THE COURT: I wanted to give counsel the opportunity to research the issue and make a full argument and I don't think counsel has had the opportunity. He's withdrawn the question and he's going to be able to research it and I want to hear what both counsel have to say on that issue.

[DEFENSE COUNSEL]: That question should not have been asked and he tried to introduce that matter.

THE COURT: We'll resolve this issue later.

[DEFENSE COUNSEL]: That question—we all know as experienced trial attorneys that the question sometimes is more important than the answer and he intentionally asked the question. Now the jury has been given that information so I don't think he should be allowed to argue later on. The jury has been informed and improperly tainted. It's improperly contaminated the jury. That information was not presented in the case-in-chief and he just didn't do it. Mr. [DPA] made a major mistake regarding Count III and IV and now he's try [sic] to resolve it so I have a problem with this jury being given that information.

THE COURT: Well, Mr. [DPA]—I can understand why he tried to enter the information. He believed it was a stipulation. I've explained to him my position. He understands it now, but I can understand why he attempted to do that.

[DEFENSE COUNSEL]: I say it's prosecutorial misconduct.

THE COURT: It does not rise—the court will make a finding that it does not rise to prosecutorial misconduct. There was a stipulation and I stated that was an unusual situation where there was an agreement by the parties as to that point, prior information. The issue is complicated because there is case law saying it's an abuse of discretion if you reopen a case so that issue still remains. I do not find prosecutorial misconduct. Motion for mistrial is denied. I find that it was not sufficiently prejudicial. I will inform the jurors to disregard the last response as well as the question.

[DEFENSE COUNSEL]: But the question has already been—

THE COURT: I'll also advise them not to draw any inferences from the question itself. Thank you.

(BENCH CONFERENCE CONCLUDED)

THE COURT: Ladies and gentlemen, the objection to the last question was sustained. You're to disregard any response given. You are not to draw any inferences or speculate from the question itself. You're to disregard the question itself. It is not evidence. Thank you. You may proceed.

After Little Kolo finished his testimony and the defense rested, defense counsel brought up the presence in the gallery of the Prosecuting Attorney himself:

[DEFENSE COUNSEL]: The presence of Peter Carlisle in the courtroom. Peter Carlisle came into the courtroom, a public courtroom. He sat in the back during examination or cross examination. When the court recessed, Mr. Carlisle moved right behind Mr. [DPA], still in the gallery, and then as every juror went by, he acknowledged their greetings, every single juror.

Now, in my opinion, that's an attempt to bolster improperly the prosecutions' [sic] case, that this is a serious enough case that Carlisle will come down as someone who has great public presence. He's on the T.V. news all the time, on a weekly basis. He had the largest percentage of voters vote for him in the last election, over 66 percent.

I am a little concerned when Mr. Carlisle shows up at a critical moment in the trial and in my opinion, attempts to improperly bolster the prosecution's case by standing there and greeting the jurors as they leave and following them out in the hallway.

THE COURT: Your objection is noted.

[DEFENSE COUNSEL]: So noted.

At long last, the circuit court decided the motion for judgment of acquittal. In this regard, the DPA withdrew his request to reopen the State's case in order to read the stipulation to the jury. The DPA insisted that the stipulation was already the "law of the case" and that the circuit court could read it to the jury along with its instructions, with impunity. Defense counsel disagreed, maintaining that the stipulation still had to be put in evidence in the State's case. The circuit court agreed with the defense, and further found that to allow the State to reopen its case to present the stipulation would be an abuse of discretion under *Kwak*. Defense counsel reiterated his motion for judgment of acquittal on counts III and IV, and added count II, as he had apparently given some thought in the interim to the fact that the stipulation also stated a material element of the charge of place to keep loaded firearm. The circuit court granted the motion *in toto*.

During its final instructions to the jury, the circuit court reminded the jurors, "You must consider only the evidence which has been presented to you in this case and such inferences therefrom as may be justified by reason and common sense." Also, "Statements or remarks made by counsel are not evidence." Further, "You must disregard entirely any matter which the court has ordered stricken." And in general,

You must not be influenced by pity for the defendant or by passion or prejudice against the defendant. Both the prosecution and defendant have a right to demand, and they do demand and expect, that you will conscientiously and dispassionately consider and weigh all of the evidence and follow these instructions, and that you will reach a just verdict.

At the commencement of closing arguments, the circuit court reminded the jury that

the arguments made by counsel are not evidence. As you understand, evidence comes by way of testimony from witnesses after they have taken an oath to tell the truth and from exhibits that have been received for your consideration. You are to rely upon your independent and/or collective recollection of what you believe the evidence has shown in this case.

During his rebuttal argument, the DPA used the hoary "red herring" analogy without objection in a number of contexts:

Now, [defense counsel] mentions the innocent [sic] project. He brought that in opening and talked about it again. And again, what we say is not evidence. There was no evidence about the innocent [sic] project, but generally, the innocent [sic] project deals with eye-witness accounts of people who did not know the defendant and a lot of times, it's cross racial.

We don't have that here. We have witnesses who knew Elu for years, for months to years, many of them who grew up with him from small kid time so that's not an issue in this case. The innocent [sic] project is—you know what this is? That's a red herring. That's what the innocence project is. And just a brief background of what a red herring is. Back when they used to do fox hunts, people would be on horses, they'd have dogs, and they let a fox go and they will chase it.

And what the servants of the people hunting the fox would do to make it harder to catch the fox, they'd bring these fish, herrings, slice 'em up so they're bleeding and they'd drag 'em across the trail to throw the dogs off. So the dogs would be going down, smell the blood in the fish, take off after the false trails.

That's what a red herring is and that's what we have here, red herrings being dragged across the trail, red herrings being dragged all over the place to keep you guys from seeing what's actually happening in this case. So that's what happened back then. Here, we have you, the jury, and the truth and the red herrings are all over the place to keep you guys from seeing what actually happened.

First red herring, methamphetamine....

....

The only purpose to bring in methamphetamine is to make Tupu and the other witnesses look like bad people. That's what it's there for, again, and to get you

off track. Methamphetamine is a red herring, ladies and gentlemen.

Next red herring, what happened before going to the bridge. A lot of talk about what happened before going to the bridge, . . . It doesn't matter what happened before they got to the bridge because again, it's simply an attempt to smear [the eyewitnesses] and Tupu. It's a red herring.

Gunshot residue on Tupu's outer left hand. The testimony overwhelmingly, Tupu was right-handed. No evidence Tupu had a gun. No evidence anyone but Elu had a gun. Again, a red herring . . . .

. . . .

Elu was not arrested till 48 hours later. No gunshots [sic] residue would have been on Elu at that time. Gunshot residue on Tupu was from being shot, period. Again, gunshot residue, that's a red herring.

The other shooter, someone else shot Tupu. Maybe it was Silent, but wasn't me. There's no evidence of that. Even defense [sic] own witness says nobody else—he didn't see anyone with a gun, not Tupu, not Silent, not anyone. The other shooter is just a red herring. There is no evidence of any other shooter, but you gotta say something because we got all this other evidence. Red herring.

The jury found Defendant guilty as charged in both remaining counts, murder in the second degree (count I) and use of a firearm in the commission of the murder (count V). The circuit court entered its judgment on January 10, 2006, and Defendant filed his notice of this appeal on February 9, 2006.

## II. Discussion.

### A.

Defendant first complains that the DPA committed prosecutorial misconduct when the DPA "intentionally and egregiously questioned [Little Kolo] during the defense's case as to whether he knew that his brother, [Defendant], had a prior felony conviction, contrary to the ruling by the court that the issue of the admission of a prior felony to prove felon in possession was under advisement." Opening Brief at 30 (capitalization omitted). In addition, Defendant contends the circuit court abused its discretion in denying his oral motion for a mistrial on account of the DPA's question. We disagree on both counts.

When confronted with the query "whether the alleged prosecutorial misconduct reached the level of reversible error, the reviewing court considers the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." State v. Kupihea, 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996) (brackets omitted). When the question is presented in the context of a motion for a mistrial, "[p]rosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. McGriff, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted).

We certainly do not condone the DPA's apparent attempt to preempt the circuit court's consideration of the issue under advisement. It exposed the jury to a prior felony conviction that turned out to be inadmissible. Even so, assuming misconduct arguendo, the circuit court's curative instruction was immediate, clear and cogent, and was rendered even more cogent by the light of the relevant general instructions the circuit court gave to the jury. Cf. Kupihea, 80 Hawai'i at 317–18, 909 P.2d at 1132–33 ("this court has repeatedly held that improper comments by a prosecutor can be cured by the court's instructions to the jury and that it will be presumed that the jury adhered to the court's instructions" (citations omitted)); McGriff, 76 Hawai'i at 160, 871 P.2d at 794 (same). Furthermore, the evidence that it was Defendant who committed the blatant act of violence—especially the testimony of the four eyewitnesses, each of whom knew both Defendant and Tupu very well—was especially strong. Accordingly, we conclude the DPA's question to Little Kolo, even if misconduct, was neither cause for vacatur, Kupihea, 80 Hawai'i at 316, 909 P.2d at 1131, nor grounds for a mistrial. McGriff, 76 Hawai'i at 158, 871 P.2d at 792.

## B.

■ Defendant next contends the Prosecuting Attorney committed reversible misconduct by sitting in the gallery during part of the trial and by acknowledging the greetings of the jurors as they filed out of the courtroom. We disagree. We do not believe it is misconduct for a prosecutor to attend a public criminal trial and to simply acknowledge the greetings of jurors, even if he or she is the elected Prosecuting Attorney. And while we have no reason before us to question the "great public presence" of this particular Prosecuting Attorney, we doubt whether even his star power could eclipse the judgment of a jury repeatedly tasked by the circuit court to conscientiously and dispassionately consider only the evidence and such inferences therefrom as are justified by reason and common sense. *Cf. Kupihea*, 80 Hawai'i at 317–18, 909 P.2d at 1132–33. Nor could it significantly advance an already very compelling case of murder. Bottom line, even if misconduct there was, it did not call for vacatur in this particular case. *Id.* at 316, 909 P.2d at 1131.

## C.

■ Defendant claims plain and reversible misconduct in the introduction the DPA used for his general *voir dire:* "I am the prosecutor in this case. And you'll notice that I don't have anybody sitting next to me at counsel table, and that's because as the prosecutor, I represent the people of the State of Hawaii in this case." Defendant complains that this was a personal attack on defense counsel, because

the DPA denigrated defense counsel's ability just because counsel had a second chair. The DPA conveyed the idea to the jury that because he represented the people of the state of Hawaii, he did not need anyone to assist him because he had justice on his side, unlike defense counsel, who needed an assistant.

Opening Brief at 23. This point lacks merit. Defendant simply misinterprets the obvious import of the DPA's remarks. The DPA was merely pointing out that he did not have a client at his side like defense counsel because he represented a necessarily incorporeal client, the people of the State of Hawai'i.

## D.

■ Defendant also charges that the DPA mounted a personal attack on defense counsel and the defense as a whole by his use of the "red herring" analogy at various times and in various contexts during his rebuttal argument. Defendant argues that "the DPA herein improperly distracted the jury by accusing defense counsel essentially of fabricating evidence and since these comments were made during rebuttal, defense counsel had no opportunity to counter the arguments." Opening Brief at 33.

Defendant supports this argument by reference to *U.S. v. Holmes*, 413 F.3d 770 (8th Cir.2005). There,

Mr. Holmes objected to a statement the government made at the beginning of its rebuttal argument: "Mr. Moss is a good defense attorney, tries to get you to focus your attention over here when what really is important is right in front of you. It's all smoke and mirrors." (Mr. Moss was Mr. Holmes's trial counsel.) The district court overruled Mr. Holmes's objection that this comment was "improper." The government continued to make similar comments about Mr. Moss later in its rebuttal argument, stating that "Mr. Moss wants to distract you and tell you about all this other evidence that's not important," and that issues that Mr. Moss had raised about who had owned the gun in question were a "red herring." The government also commented that "Mr. Moss needs to make sure that they get their stories straight" ("they" presumably referred to Mr. Moss and Mr. Holmes), and that the jury should "look at Mr. Moss's story. That's why I said he's got to get his stories straight."

*Id.* at 775. The eighth circuit found the government attorney's remarks "highly improper":

We think that these various comments referring personally to Mr. Moss and the necessity for Mr. Moss to "get his stories straight," taken as a whole and in the context of the rebuttal argument, show

that the government attorney was accusing defense counsel of conspiring with the defendant to fabricate testimony. These types of statements are highly improper because they improperly encourage the jury to focus on the conduct and role of Mr. Holmes's attorney rather than on the evidence of Mr. Holmes's guilt. Such personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case.

*Id.*

Although we long ago wearied of the trite and otiose "red herring" analogy, we withhold judgment on the eighth circuit's interpretation and characterization of the government attorney's remarks, and in particular its implicit condemnation of the "red herring" remark as "highly improper." *See State v. Clark,* 83 Hawai'i 289, 304–06, 926 P.2d 194, 209–11 (1996) (holding that the prosecutor's description of defendant's denial of drug use as a "cockamamie story" was not misconduct, and citing with apparent approval other state cases immunizing similar prosecutorial descriptions, such as "cock-and-bull story" and "smokescreen"). *See also Holmes,* 413 F.3d at 778 (Arnold, J., dissenting).

We feel it is sufficient for our purposes to observe that the eighth circuit vacated Holmes's conviction because it found "that the cumulative effect of the remarks in this case, coupled with the exclusion of admissible testimony and the relative weakness of the government's case,[2] could reasonably have affected the jury's verdict." *Id.* at 775 (footnote supplied).

Here, Defendant urges the "red herring" analogy upon us as plain error. "Therefore, we must determine whether the prosecutor's comment was improper and, if so, whether such misconduct constituted plain error that affected [Defendant's] substantial rights." *Clark,* 83 Hawai'i at 304, 926 P.2d at 209 (citation omitted). *See also U.S. v. Milk,* 447 F.3d 593, 601–02 (8th Cir.2006) (citing *Holmes* in finding the government attorney's "red herring" remark improper, but noting

that its "analysis is altered" to one of plain error because Milk's attorney failed to object to the remark). And here, the plainly overwhelming nature of the evidence against Defendant prevents us from deciding that the DPA's "red herring" analogy, if *arguendo* misconduct, "constituted plain error that affected [Defendant's] substantial rights." *Clark,* 83 Hawai'i at 304, 926 P.2d at 209 (citation omitted). *See also Kupihea,* 80 Hawai'i at 316, 909 P.2d at 1131.

## E.

For his penultimate point, Defendant claims that the DPA committed misconduct during his questioning of the evidence specialist, by bringing to the jury's attention the fact that the morgue photographs were originally in color. "By doing so, the DPA implicitly conveyed to the jury that the injuries sustained by Tupu were just too gruesome to look at in color. This was an inflammatory tactic in blatant disregard of the court's ruling and therefore constituted prosecutorial misconduct." Opening Brief at 33–34. Perhaps Defendant reads too much into the colloquy. We are inclined to agree with the circuit court that the DPA's overreaching was merely irrelevant. In any event, even if it was misconduct—and we do not decide that it was—it was nonetheless trivial. *Kupihea,* 80 Hawai'i at 316, 909 P.2d at 1131.

## F.

Finally, Defendant argues vacatur because the cumulative effect of all of the foregoing alleged errors denied him a fair trial. We disagree. Even if we grant Defendant error *arguendo* in each instance, "[t]he errors are not interrelated and each error taken individually had no effect on the outcome of the trial. Thus, we are satisfied that their cumulative effect was harmless and did not deprive the defendant of a fair trial." *State v. Amorin,* 58 Haw. 623, 632, 574 P.2d 895, 901 (1978).

---

2. The *Holmes* court judged the government's case to be "less than overwhelming[,]" because the case essentially came down to a credibility contest between the arresting officer and the defendant. *U.S. v. Holmes,* 413 F.3d 770, 776 (8th Cir.2005).

### III.   Conclusion.

Based upon the foregoing, we affirm the circuit court's January 10, 2006 judgment.