134 P.3d 616

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Moses K. KIAKONA, Defendant–Appellant.**

**No. 27224.**

Intermediate Court of Appeals of Hawai'i.

April 12, 2006.

Pamela O'Leary Tower, Honolulu, on the briefs, for Defendant–Appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

In his appeal of the November 5, 2004 judgment of the Circuit Court of the Second Circuit (circuit court)[1] that convicted him of the charge of terroristic threatening in the first degree[2] and sentenced him to a five-year indeterminate term of imprisonment, Moses K. Kiakona (Defendant or Kiakona) contends the deputy prosecuting attorney (DPA) committed prosecutorial misconduct at the jury trial. We disagree, and affirm.

## I. Background.[3]

Just before opening statements, the circuit court reminded the jury:

.... I want to remind everybody the opening statements of the attorneys and their closing arguments are not evidence in the case so when you determine you know from the evidence what the facts are and when you determine you know the guilt or innocence based upon the facts that you find, they can only be found on the evidence, but the statements of the attorneys are not evidence. That doesn't mean you should just completely disregard them because the statements of the attorneys are often helpful in determining and organizing your thoughts about those.

The statements are not evidence in the case. The evidence is what you are going to hear from witnesses and what may be received as physical evidence and any stipulations, if there are any, which are agreed to by the attorneys. You may proceed, Mr. [DPA].

1. The Honorable Joel E. August presided.

2. Hawaii Revised Statutes (HRS) § 707–716(1)(d) (1993) provides: "A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening: With the use of a dangerous instrument." (Enumeration omitted; format modified.) HRS § 707–715(1) (1993) provides: "A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause

The DPA then presented the following opening statement:

Spring break of this year, March 17th, 2004, Nicholas Terrell [ (Nicholas) ], who is 21 years old and Alandra Alvarado [ (Alandra) ] were vacationing here. Alandra is or was at that time a high school senior. It was her spring break and they decided to come to Maui to spend the week together here on Maui and they stayed in Kaanapali and **they were enjoying their week over here as many tourists do.**

And while they were here, they had been out at the beach, had been swimming on the 17th in the morning and they were heading out past Kaanapali, past Honokowai, past Napili to find a new place to swim and enjoy themselves. They kept driving past Slaughter House Bay and at Honolua Bay—at Honolua Bay, contrary to everything else heading out to Lahaina, heading out past Lahaina, now when you get to the bay, at the bridge there's a yield sign and there's two yield signs either side of the bridge, one-lane bridge, and one line of traffic is supposed to yield for the other one. Supposed to take turns.

Now, Alandra believes, although she doesn't know for sure, all she remembers is there was some kind of yield sign. **They made a mistake there, tourists.** They went through that yield sign and across the bridge. Again, she's not positive it is there, but Officer Nagata who will be testifying who worked on this case will testify that's where you come across a one-lane bridge where there's a yield sign heading out that way, Honolua Bay.

**In any event, they are tourists.** They made a mistake. They ran a yield sign. The first person in line coming the other direction heading from further out at Honolua Bay heading toward Lahaina di-

bodily injury to another person or serious damage to property of another or to commit a felony: With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]" (Enumeration omitted; format modified.)

3. Bolded passages *infra* are those specified on appeal as exceptionable or indicative of the deputy prosecuting attorney's objectionable intent.

rection was the defendant, and he was waiting in his Toyota Land Cruiser, the first one in line, and it was his turn **and a tourist cut him off.**

They tried to wave it off and apologize, you know, like oops, sorry, our mistake. They realized they had made a mistake as they got through. That wasn't good enough for him.

What he did was he then turned his Toyota Land Cruiser to the left toward the mountain blocking their path. At that point they stopped their Jeep. Nicholas was driving and they stopped their Jeep. They had one of those rented small Jeeps. They stopped their Jeep. They made a turn around right there. Really no place to turn around, but they did it anyway. They got scared. They realized things weren't going well and the defendant wasn't going to take a smile as an apology.

They turned around there and they headed back toward the Lahaina/Kaanapali area. The defendant followed and this continued all the way to Lahaina police station, somewhere in the neighborhood of—Officer Nagata will tell you—12 to 15 miles, and the first part of the road is very windy road. As you're heading back in once it becomes open highway, then it opens up for a while and you get into heavy traffic as you get to Napili, Honokowai and Lahaina.

The defendant chased them the entire way driving his Toyota Land Cruiser several times trying to run them off the road, driving on the side of them, running up on their bumper, using this Toyota Land Cruiser as a weapon to terrorize this young couple. This continued at speeds— and then you will have independent witnesses come in.

Cory Hile [ (Cory) ] and Keaka Kaahui [ (Keaka) ] will be testifying that they are driving on the road and had nothing to do with this. They're driving along on the road and they see this Jeep blow by at an extremely high rate of speed followed by a Toyota Land Cruiser at a very high rate of speed.

You will hear testimony that they blew red lights repeatedly, that they ran through red lights. The Jeep would run through red lights and the defendant would continue to chase running through the red rights. You will hear Alandra testifying how she was in a panic because they knew they couldn't stop because if they stopped, they were afraid the defendant would do something to them. They just wanted to run and run and run and run.

The defendant continued to chase. There are estimates by people guessing 70 or 80 miles an hour is their speed they were going. This is not a case of the defendant wanting to say hi to them or anything. He's chasing them. The chase ends.

Interestingly, Alandra and Nicholas remembered that there's a police station in Lahaina and there's a turn-off to the police station. They were staying in Kaanapali. They passed that turn-off and continued to the turn-off. At the police station they got in the left turn lane to turn to the police station. The defendant still continued behind them, and when they got into the left turn lane that goes up to the police station, the defendant drove past them and gave them the shaka sign and kept continuing on. He did not follow them up to the police station.

They immediately went in and talked to Officer Nagata. They made a police report. The radio call went out to look for the defendant in this Land Cruiser. He was located near Shaw Street. He was stopped by the police. He made a brief statement to [Officer Kaneshiro] that they did violate a yield sign and he was pissed off that they violated the yield sign, that he wanted to talk to them about that, and explained to them that was not the proper way to do things. In this case the defendant was using his vehicle as a weapon and that's why the charge of terroristic threatening. Thank you.

Defense counsel offered the following opening statement:

Ladies and gentlemen, this case is not a case about road rage and it is not as simple as [the DPA] would like to believe.

What the evidence will show you is that Nicholas, who will not appear here to testify for you today or tomorrow or at any time in this week, he's not even going to come to see you about this case.

He was driving a Jeep with his 17-year-old girlfriend in it, driving way too fast for a one-lane bridge. He could not stop at the yield sign. He forced Mr. Kiakona off of the road and into the guardrail.

Mr. Kiakona stopped his vehicle and Nicholas stopped his. Mr. Kiakona got out of his car to look at the damage to his vehicle and pointed at the yield sign and asked him, "Why didn't you stop?" The kid in the car, Nicholas, gave him stink eye and flipped him the finger, burned rubber, did a U-turn and sped away. That's what happened.

Mr. Kiakona was trying to chase him in order to get information that should have been exchanged at the scene. It was Nicholas who was driving recklessly speeding through stop lights, red lights, stop signs, driving at an excessive rate of speed. Mr. Kiakona was doing his best to keep up with him.

In the meantime, Mr. Kiakona's brother James is in the passenger seat shaking his fist at this guy, giving him the finger, and yelling at him. Mr. Kiakona can't calm his brother down. He can't catch up with this nut that drove him into the guardrail and sped away from the scene.

He finally catches up with him at the stop light, rolls down the window, gave him a shaka sign to say hey, let's exchange information. His brother is still yelling and screaming and Mr. Kiakona realizes I can't keep this situation under control. It has gone far enough already. If we get out of this car, I don't know what my brother is going to do to this guy. We're getting out of here and they drove off.

That's exactly what happened. The brother will come in and testify the aunt was behind them when the accident occurred. She couldn't believe what she saw when the Jeep refused to yield at the yield sign and screeched away from the scene leaving Mr. Kiakona sitting. They were still outside his Jeep. I am not sure if he will tell you whether he climbed back in at the time the guy took off, but at any rate she saw the entire thing occurred, and she went to the police station. She was one of the first people at the police station so everything [the DPA] has told you about Mr. Kiakona using the vehicle as a dangerous instrument is completely false.

He was in a situation where he was forced to try and catch up with the driver who left the scene of an accident. That's exactly what this case is about, and at the end of the case we are going to ask you to bring in a judgment of not guilty. I am certain after you hear all of the defense witnesses testify, you will be convinced Mr. Kiakona should not be convicted of Terroristic Threatening in the First Degree. Thank you.

Officer Nagata, Cory, Keaka, Officer Kaneshiro and Alandra testified for the State. James, Officer Nagata, Defendant's aunt and Defendant testified for the defense. All of the witnesses testified essentially as the DPA and defense counsel said they would.

In addition, Alandra described her ex-boyfriend Nicholas: "He's tall, blond hair, blue eyes and he's a white." Alandra also recounted her experience of the incident, starting with the standoff on the bridge:

A. When we came to—at the moment when we came to a stop, the two people in the car kind of got—I guess they did get angry. You could tell by the expression on their faces. They drove the car over to us kind of blocking us in where Nick didn't have another choice but to put the car in reverse and back up when there was like a hill behind us where he could have hit, but he didn't, and so the white car blocked us into the point where he we had no choice but to drive the other way back the way we came from.

. . . .

A. Right after that we were pretty scared already because we could see that they were really mad and they were you know kind of—they were trying to run us over, you know.

. . . .

A. Then Nick took off. He started going really fast and for a few seconds we didn't see the car, the Toyota, so then a few seconds later we were looking in the rearview mirrors and we see the Toyota coming behind us really fast, also.

. . . .

A. Because we were afraid that they would hurt us if we pulled over because we knew that they didn't just want to talk. We knew that it was more. They were angry.

. . . .

A. Because like I said their expressions and the way they were coming toward us, intimidating.

. . . .

A. The car, the Toyota, was—they began to cut off the cars, the traffic behind us, and swerving in and out of lanes to get as close to us as possible. Then they would get to the side of us and use their hands to—their hand motion to put a face or breaking neck and they would yell out the window that they were going to break our neck and stuff like that.

. . . .

A. [Defendant] would say just the same stuff like, "beat you up," stuff like that.

. . . .

A. They would kind of jerk the car over to us and it looked like they were going to hit us, but they didn't. They were just—I think they were just trying to get us to pull over off the road.

. . . .

A. [Nicholas] would just go faster as much as he could, and then I was panicking really bad because I was really scared and he was kind of scared, also. I knew he was scared.

Under cross-examination, Defendant's aunt had the following exchange with the DPA:

Q. So when you folks are coming out from Honokohau, the people have a right-of-way? The people coming in are supposed to wait to make sure it is clear?

A. Yeah.

Q. And this **tourist,** he didn't follow those rules? He just went right through?

. . . .

Q. This **haole tourist** from the mainland comes over here and he doesn't follow the rules of the road and Moses was mad?

A. He didn't call him haole. He didn't even call him names. We don't put it that way.

Q. But he was mad?

A. I didn't say he was mad. If he was mad—he's a changed man. If he was mad, would have been something worse I think.

On direct examination, Defendant told his counsel:

A. Nobody moved so I jumped out of the car and told them, "Brah, you got the yield sign." The tourists always do that at that yield sign so like a natural thing. We always tell tourists, "Brah, you got yield sign." So I kept telling the guy you got the yield sign. He was like—so I got out and tried to approach the vehicle and he was like, you know, I don't know if he thought I wanted for fight him or not. I know he started revving his engine then.

. . . .

A. I was mad. I was like this guy going to come here and damage my car and I work hard for my stuff. He's not going to just do this to me and just leave. I mean I work hard for my stuff.

. . . .

A. I did so many things. I was pissed off. I just—I just went bang the guardrail and he giving me the attitude like I was wrong. You know, I was pissed off pretty much.

. . . .

A. I say, you know, I was irate. "F" you, asshole. Fuck you, you asshole. Fucking pull on the side."

On cross-examination, Defendant told the DPA:

Q. Okay. Now, going back to when you were at the bridge, at the very beginning you are at the bridge at Honokohau Bay, you see this—you have the right-of-way and you are crossing the bridge and you

see this tourist Jeep coming through and you recognize it as a tourist Jeep, correct?

A. Yeah.

. . . .

Q. And you drive that road every day because you live out in Honokohau Valley?

A. Yeah.

Q. And you also testified that you always see tourists doing that because they miss that yield sign and they do it all the time?

A. Yes.

. . . .

A. You couldn't tell they was young. In fact, I thought they was Mexicans.

Q. But you heard the girl testify he had blond hair and blue eyes?

A. Like I said, I couldn't see.

. . . .

Q. **So you would agree that Honokohau Valley on the west side of Maui that's all your home turf, right?**

A. **I live there. I don't call this my turf. I don't own anything. I live there.**

Q. **Correct. You live there, but—**

A. **I don't own everything.**

Q. **That's where your family is from? Your family is from the west side?**

A. **Born and raised.**

Q. **And these tourists who you thought might have been Mexicans, obviously they're not from west Maui, they didn't look like they're from west Maui?**

A. **No.**

. . . .

Q. What effort did you make to get them to pull over?

A. Chasing them the whole way, telling 'em for pull over with my hand, pull over.

Q. So now you are saying you are pointing your hand?

A. I show finger, everything. I point my hand, too.

On re-direct, Defendant explained to his attorney:

Q. Mr. Kiakona, when you were first going onto the bridge, were you trying to be a bully? When you went on the bridge,

did you see the tourist's car coming and you thought oh, gosh, he ran the yield sign, I am going to force him to back off of the bridge?

A. No. I mean—I mean everybody got attitude in the valley like tourists come here, this and that, but I feel like I had the yield sign. Why should I give them the decency or leeway? I never had that for run my car into him.

. . . .

Q. Would you have been just as angry if somebody that you knew from Lahaina had blown through that yield sign and run you into the guardrail?

. . . .

Q. Were you angry because a tourist ran you into the guardrail, or were you angry because you were run into the guardrail?

A. Anybody who make damage a car you going to get mad. We all going to dispute on how we going to get damages fixed and stuff like that.

Q. It wasn't because it was a tourist?

A. No.

After answering questions from the jurors, Defendant followed up with his counsel:

Q. Mr. Kiakona, regarding that particular yield sign and whether or not you ever seen other people come through it before, have you ever seen anyone come through that yield sign in such a manner as to actually cause an accident and back up traffic on the bridge?

A. The pineapple trucks—that's what happened to pineapple trucks. Get big dents on the guardrail because of tourists not yielding at the yield sign.

Q. What about you?

A. Did I?

Q. Have you ever had anyone run— have you ever seen anybody run the yield sign and then slow down and stop anyway?

A. No. I was only there for two years so I never did see anybody do that, but I know that I always see tourists run yield signs. They always yell at them when

they do the yield type and stupid this, and I don't like offend anybody what I say.

Q. So you would say that, or you wouldn't say that?

A. I would say stupid tourist, you know.

Q. To them or to yourself?

A. Yo, all like stupid tourists. I don't like offend nobody, like stupid haole.

The circuit court's instructions to the jury included the following:

Instruction 4. You must consider only the evidence which has been presented to you in this case and such inferences there-from as may be justified by reason and common sense.

. . . .

Statements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence. . . .

. . . .

You must not be influenced by pity for the defendant or by passion or prejudice against the defendant. Both the prosecution and the defendant have a right to demand, and they do demand and expect that you will conscientiously and dispassionately consider and weigh all of the evidence and follow these instructions and that you will reach a just verdict.

The DPA's closing argument contained the following passages:

The defendant, as you saw in his testimony, is very, very, very good at sounding like a victim, like sounding like hey, for me he very good at it, but as you will see, his explanation and the only thing he could think of to try to explain his actions really does not make any sense at all.

Did you notice, however as a prelude, and I am going to talk quite a bit about the defendant's explanation because if you realize his explanation doesn't make sense, then you realize that he had no explanation at all for his actions, but did you notice that even if hypothetically there was an accident at the bridge, the accident was caused the defendant's own arrogance by his own testimony because he said he saw the Jeep and this happens to him all the time.

He lives out in Honokohau Valley. He always sees this happening, and yet he saw the Jeep coming. He saw the Jeep violate the yield sign and he still went forward and that he didn't hit the Jeep. The Jeep didn't hit him. He hit the side according to his own explanation, so his only—his own arrogance that got him in trouble in the first place and that is what got him in trouble.

That's why he's here in court, his own arrogance, **his own attitude he says the people in the valley have because it is his turf and these tourists come over there and they cause trouble and they need to be taught a lesson. That is what this case is about. He's trying to teach these tourists a lesson.**

. . . . You know that's the defendant's Land Cruiser. There's no dispute about that. Was it being used as a dangerous instruments in this—on this fact pattern? Yes.

And he did so with the intent to terrorize or in reckless disregard of the risk of terrorizing Nicholas Terrell and/or Alandra Alvarado, and you know that's true because that's his whole point. He's was trying to terrorize them. **He was trying to teach these tourists a lesson.**

. . . .

What he did that day was he got really pissed off at these tourists for some reason at the bridge, and you know what, Nicholas Terrell may have been kind of cocky, nobody knows, but he might have been you know hey, he got his young girlfriend and came to Maui, you know, cruising around, having a good time, maybe he was a little cocky, maybe he was terrified once he realized oh-oh, I got these **two local males** pissed off at me. I am way out in the boonies. **His own family trailing behind,** although Nicholas probably didn't know this, **but defendant knew his whole family—he got family behind him backing him up, okay.**

So Nicholas is out there. Maybe Nicholas was cocky. Maybe he wasn't. For

whatever reason he screwed up. He didn't follow the rules, okay, and that pissed the defendant off.

Then what happened that pissed the defendant even more off was that when Nicholas backed up, the defendant followed and then Nicholas took off. By the defendant's own explanation, he was left standing in the dust, right. The defendant's own explanation is he got out and **this young punk from the mainland coming over here, a Mexican with blond hair and blue eyes, right? He knew it was blond** hair and blue eyes.

. . . .

. . . . That's what Moses Kiakona is. He gets behind the wheel of a car and he is somebody completely different, **especially when he's in his own turf.**

He's right on you there by Honokohau Valley and Honolua Bay. **That's his turf and had haoles come over here everyday and they violate that yield sign. We have the right-of-way. We have an attitude, all of us in the valley. They come over there and they come with their attitudes come over here thinking well, we can come over here and we can run all over your island.** No, no. Moses got to teach these **haoles** a lesson, these **haoles** that do this over and over again to him. He's going to teach these two haoles a lesson, and he's scared them to death. He taught them a lesson. He scared them to death, but you can't do that. You can't do that to people.

Defense counsel's closing argument included the following remarks:

The government started its closing argument by telling you this case is about logic and physics. It is not. The case is about criminal intent, the intent to terrorize, and whether or not threats to terrorize were made. That is what the case is about.

Logic and physics comes into play when you review the evidence.

This case is not about logic and physics. It is about Mr. Kiakona and whether or not he possessed criminal intent. . . .

. . . .

If there is any clear evidence beyond a reasonable doubt that there was a Terroristic Threatening in the Second Degree by word or conduct, it is the word or conduct of the passenger in saying I am going to break your neck and I am not even sure what the hand gesture was that Alandra Alvarado said he was using to indicate that.

Not Mr. Kiakona. His testimony was clear. His testimony was so clear and brutally honest with you that he even embarrassed himself by looking at you and saying, "Yeah, you know, I have said stupid haoles and I apologize," and stuff like that. He could not have been more honest with you, and I am sure you saw that when he testified, and at any rate he indicated to you that everytime he had a chance to make a gesture or yell, he was telling him to pull over, and even Alandra Alvarado testified that when he pulled up next to them at the stop sign, he said something about the intersection and then gave them the shaka, and remember I asked her to show the jury what the symbol because she didn't know the word shaka. She called it hang loose, remember, and she showed you a symbol. That's exactly what he did.

It took all of a morning for the jury to find Defendant guilty as charged.

## II. Discussion.

 Defendant raises a single point of error on appeal: "The circuit court committed plain error[4] in failing to admonish the

---

4. Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2005) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Obversely, HRPP Rule 52(a) (2005) provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." "The general rule is that a reviewing court will not consider issues not

raised before the trial court." *State v. Corpuz*, 3 Haw.App. 206, 211, 646 P.2d 976, 980 (1982). "This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *State v. Kelekolio*, 74 Haw. 479, 515,

prosecutor and instruct the jury that the prosecutor's appeal to racism is intolerable and must be disregarded." Opening Brief at 24 (footnote supplied).

■■■ "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff*, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted).

It is a well-settled principle in this jurisdiction that allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.

*State v. Klinge*, 92 Hawai'i 577, 590, 994 P.2d 509, 522 (2000) (brackets, citations, and internal quotation marks and block quote format omitted).

As a threshold matter, we consider whether the actions of the prosecutor *sub judice* did indeed constitute prosecutorial misconduct. *See, e.g., McGriff*, 76 Hawai'i at 160, 871 P.2d at 794 (first holding that there was no prosecutorial misconduct, then considering prejudice *arguendo*); *State v. Lincoln*, 3 Haw.App. 107, 125, 643 P.2d 807, 820 (1982) ("Since we find that the [prosecutor's] comments were not improper, we need not address the question as to whether the [jury] instruction cured the problem that would have been created by an improper comment." (Footnote omitted.)).

On this threshold issue, Defendant cites the supreme court's opinion in *State v. Rogan*, 91 Hawai'i 405, 984 P.2d 1231 (1999), and our following opinion in *State v. Shabazz*, 98 Hawai'i 358, 48 P.3d 605 (App.2002). Thereupon, he argues:

It is beyond dispute that the "haole" "blond haired blue eyed" "tourists" from the mainland to whom the prosecutor referred are the complainants Terrell and Alvarado. It is equally clear that the "local" males to whom the prosecutor referred are the defendant, Moses Kiakona, and his brother, James Kiakona. The "turf" to which the prosecutor repeatedly alluded is West Maui, where Kiakona was born and raised. The "family behind him" was a reference to Kiakona's aunt, Ulu Jaramillo and her grandchildren, who were behind Kiakona at the bridge. In the context of proving the elements of the case, the prosecutor's use of the words "tourist" "haole" "local" and all that they signify, had "no legitimate bearing on … [any] issue in the case, such as identification by race." *Shabazz*, 98 [Hawai'i] at 377, 48 P.3d at 624.

The fact that the complainants here were Caucasian tourists on vacation in Maui served no evidentiary value. Criminal statutes protect everyone in the State of Hawaii irrespective of their ethnicity, where they come from, why they are here and how long they intend to stay. Instead, the prosecutor's argument left the distinct impression that tourists, particularly *blond haired blue eyed tourists from the mainland*, are entitled to some higher protection by virtue of their genes and geographic location.

The fact that Kiakona is a Hawaiian who was born and raised in West Maui served no evidentiary purpose. Identity, by race or otherwise, was never an issue—Kiakona never denied driving the Toyota Landcruiser and his defense was one of no intent to terrorize. The word "turf" also had no probative value. The prosecutor here was asking the jury to convict Kiakona not on the basis of the evidence but because of Kiakona's race and a perceived racial animus between "local" males who

---

849 P.2d 58, 74–75 (1993) (citation omitted). "This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (brackets, citation and internal quotation marks omitted).

protect their "turf" from "haole tourists" by terrorizing them to "teach them a lesson." The *Shabazz* court queried: ". . . why a simple reference to "young woman" would not have sufficiently served the purpose, without the *volatile* reference to "local[.]" *Shabazz*, 98 [Hawai'i] at 380, 48 P.[3]d at 627 [emphasis added]. One could ask the same question here. Here Kiakona's origin as a "local" became a "code word for race." *Shabazz*, 98 [Hawai'i] at 377, 48 P.[3]d at 624. Finally, the inflammatory reference to Kiakona as a "local" was further compounded by the prosecutor's statement that Kiakona was out to teach "haole tourists a lesson" "by evok[ing] sympathy for . . . [Alvarado] and represented an implied invitation to the jury to put themselves in her position." *Rogan*, 91 [Hawai'i] at 414, 984 P.2d at 1240.

Opening Brief at 31–32 (Ellipses, emphases, and some brackets in the original).

 We disagree with Defendant's argument. The DPA did not commit *Rogan/Shabazz* misconduct by resort to arguments or interrogatories "that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors" and lack "a legitimate bearing on some issue in the case, such as identification by race." *Shabazz*, 98 Hawai'i at 376, 48 P.3d at 623 (emphasis and block quote format omitted) (quoting *Rogan*, 91 Hawai'i at 413, 984 P.2d at 1239).

As Defendant argued below and both parties agree on appeal, the central issue at trial was criminal intent—whether Defendant went after Nicholas and Alandra in order to terrorize them or merely followed them in order to settle details the alleged accident entailed. The references to "turf," "locals" and "haole tourists" crystallized the motive behind Defendant's criminal intent—his resentment of Caucasian tourists and their supposedly highhanded ways in the place where he was born and raised. And there was ample support in the evidence—including Defendant's own testimony—for the imputation of that motive. As *Rogan* and *Shabazz* recognized, "the mere mention of . . . status . . . as shown by the record may not be improper if it has a legitimate bearing on some issue in

the case[.]" *Shabazz*, 98 Hawai'i at 376, 48 P.3d at 623 (block quote format omitted) (quoting *Rogan*, 91 Hawai'i at 413, 984 P.2d at 1239).

Where, as here, references to status had a *fundamental* bearing on the *central* issue in the case, they were not improper. Because there was no prosecutorial misconduct in the first place, our inquiry is at an end. *McGriff*, 76 Hawai'i at 160, 871 P.2d at 794; *Lincoln*, 3 Haw.App. at 125, 643 P.2d at 820.

### III. Conclusion.

There being no error, much less plain error, we affirm the November 5, 2004 judgment of the circuit court.

