STATE OF HAWAI`I, Plaintiff-Appellee,
v.
AIRINO ASARIN, Defendant-Appellant.
No. 27728
Intermediate Court of Appeals of Hawaii.
March 19, 2008.
On the briefs:
Frank M. Fernandez, for Defendant-Appellant.
Daniel H. Shimizu, Deputy Prosecuting Attorney, City and County of Honolulu, for Plaintiff-Appellee.

MEMORANDUM OPINION
RECKTENWALD, Chief Judge, WATANABE, and NAKAMURA, JJ.
Defendant-Appellant Airino Asarin (Asarin) appeals from the Judgment filed on December 28, 2005, in the Circuit Court of the First Circuit (circuit court).[1] After a jury trial, Asarin was found guilty of second degree murder, in violation of Hawaii Revised Statutes (HRS) § 707-701.5 (1993).[2] The circuit court sentenced Asarin to life imprisonment with the possibility of parole.
On appeal, Asarin argues that the Deputy Prosecuting Attorney (DPA) engaged in prosecutorial misconduct by making remarks during closing argument that Asarin contends misstated the law, thereby prejudicing Asarin's right to a fair trial. As Asarin did not object to any of these remarks at trial, we review only for plain error. State v. Klinge, 92 Hawai`i 577, 592, 994 P.2d 509, 524 (2000). We affirm.

BACKGROUND

I.
Asarin and his wife Vivian Asarin (Vivian) were both from Chuuk. They were married in 1995, moved to Honolulu in 1998, and had four children together. Their marriage was troubled. During their marriage, Asarin had a long-term relationship with another woman, with whom Asarin had purportedly fathered a child. In about March 2004, Vivian became romantically involved with ST Salle (Salle), a man she had known during high school in Chuuk. Asarin learned of this relationship shortly after it began and told both Vivian and her niece, Virginia Peter, that he was broken-hearted over it.
Asarin was charged with murdering Salle, Vivian's boyfriend. The alleged murder took place on June 15, 2004. Asarin and Vivian lived with their four children in a two-story, two-bedroom apartment, which they shared with Vivian's brother Tim Terno, his wife Susan Terno, and the Ternos' three children. The apartment consisted of a living room, a kitchen, and a small bathroom on the first floor, a stairwell, and a bathroom and two bedrooms on the second floor. The Terno family occupied one bedroom and the Asarin family occupied the other. Asarin and Vivian slept on a bed and the children slept on mattresses on the floor. Several days before the alleged murder, Asarin moved out of the apartment and began living with his cousins.

II.
At about 1:00 a.m. on June 15, 2004, Vivian brought Salle to the apartment to spend the night. Vivian's children were asleep on the bedroom floor when Vivian and Salle retired to Vivian's bedroom. The Terno family was also asleep in their bedroom, and Virginia Peter (Virginia), who was visiting, went to sleep on a sofa in the downstairs living room.
Vivian testified that around 4:00 a.m., she and Salle awoke to the sound of someone knocking on the bedroom door. Vivian opened the door thinking it might be Susan Terno or Virginia, only to discover Asarin standing there. Asarin turned on the bedroom light and asked Vivian who her partner was. He also asked Salle why Salle was there and pointed out that the children were present, which prompted Salle to apologize. Asarin took Vivian by the hand and led her downstairs to the kitchen, where Asarin pulled a knife out of the drawer. Vivian screamed and ran back upstairs to her bedroom but found that the door was locked. Asarin followed behind Vivian and held the knife up near his face in a closed fist. Vivian assumed that Asarin was going to stab her, so she ducked into a closet, then ran downstairs and out of the apartment. As she ran, Vivian heard Asarin punching the bedroom door.
Virginia testified that she woke up when Asarin and Vivian came down the stairs to go to the kitchen. Virginia saw Asarin pull Vivian into the kitchen, and Virginia told the police that she heard Vivian say, "[W]hat are you doing with the knife, we might get hurt[.]" Vivian instructed Virginia to call the police and then ran back upstairs. Asarin followed Vivian holding a knife and saying, "What do you want? You want me to stab, kill you, you guys?" Virginia ran outside with her cell phone and dialed 911.
Susan Terno (Susan) woke up to the sound of Vivian screaming and opened her bedroom door to see Vivian and Asarin run up the stairs and struggle in the hallway in front of Vivian's bedroom. According to Susan, Asarin pushed Vivian out of the way, and he began kicking and pounding the door to Vivian's bedroom. The door opened a little and Asarin and Salle started struggling. Asarin had his hands up parallel to sides of his head and Salle was holding Asarin's fists. They struggled down the hallway, and it appeared to Susan that Salle was trying to run away.
Susan testified that the two men fell to the ground at the top of the stairway. Salle ended up on his back with Asarin sitting on Salle's stomach. Asarin told Salle that what Salle had done had broken Asarin's heart. Susan saw the knife in Asarin's right hand. Salle was using both his hands to grab Asarin's right hand, but then Salle lost his grip. Susan tried to get Asarin's attention by telling him to think about his kids, and she also tried to grab Asarin around the waist. Susan saw Asarin raise his right hand and thrust downward toward Salle, and Susan closed her eyes and turned her head away. Both men then tumbled down the stairs and out of Susan's sight.
Susan remained upstairs. Asarin later came back up the stairs to apologize to Susan's husband. Asarin looked confused. Susan asked Asarin for the knife, and Assarin gave Susan the knife and went back downstairs. Susan washed the blood off the knife, which had an eight-inch blade, and later gave the knife to the police. When Susan went downstairs, she saw Salle's body lying on the kitchen floor.

III.
A short time after police officers arrived at the scene, they saw Asarin walking toward the apartment. Asarin was arrested. The arresting officer saw blood on Asarin, but upon checking Asarin, did not find any injuries. Asarin appeared calm and coherent, and he cooperated with instructions given by the officers.
Salle was pronounced dead that same day. Dr. Gayle Suzuki (Dr. Suzuki), the Deputy Medical Examiner for the City and County of Honolulu, performed Salle's autopsy. Dr. Suzuki testified that Salle suffered incise wounds to his scalp, nose, lip, hands, shoulders, arms, and chest, all of which could have been inflicted with a knife. She characterized the incise wounds to Salle's hands as "defense wounds," which she defined as "wounds that someone would get if they're trying to ward off an attack."
Dr. Suzuki testified that Salle suffered two major stab wounds to the chest, both of which measured approximately eight inches in depth. The fatal stab wound penetrated through Salle's breast bone, punctured the right side of his heart, severed a major blood vessel, and continued all the way into his spine. This wound caused internal bleeding into Salle's chest cavity, and Salle bled to death. The other stab wound penetrated between two ribs and cut part of Salle's lung and diaphragm. Dr. Suzuki stated that the stab wounds were consistent with the decedent lying on his back, the assailant straddling the decedent's body, and the assailant stabbing the decedent in the chest with a single-edged knife with an eight-inch blade. Dr. Suzuki opined that the stab wound that penetrated the breast bone would have required a significant amount of force and would not have been sustained if Salle had merely collapsed on the knife. However, she acknowledged that the force of two bodies struggling and falling to the ground could have been sufficient to cause the wound.

IV.
Asarin testified at trial with the assistance of an interpreter. Asarin testified that he discovered Vivian's relationship with Salle in about March 2004. The relationship bothered him and made him suffer. Asarin claimed that Vivian disappeared with Salle on several occasions between March and June of 2004, and he had to miss work to take care of the children.
According to Asarin, on June 15, 2004, after fishing with his cousins on the North Shore, he stopped by the apartment in the early morning to get a container from Vivian for his fish. When she opened the bedroom door, he was surprised to see a man sitting on the bed. Vivian was fully clothed and the man was wearing shorts. At first, Asarin did not recognize the man but soon realized that the man must be Salle. Asarin asked Salle why he was there and then asked Salle to leave. Salle said nothing and just frowned and stared at Asarin.
Asarin testified that he was afraid of Salle because Salle had made threatening remarks to Asarin over the telephone on several occasions and Asarin had heard from friends that Salle liked to fight. Asarin went downstairs to the kitchen with Vivian and saw a knife on the counter. He picked up the knife to scare Salle off, a common practice in Chuuk, and also to defend himself against Salle. Asarin ran upstairs with the knife and tried to open the bedroom door, which was locked, because he heard his children crying and feared that Salle might be hurting them. Asarin tried to force the door open by kicking, punching, and pushing against it. Salle opened the door, cursed, swung his fist at Asarin's face, and ended up hitting Asarin in the chest. Then Salle grabbed the knife and they struggled over the knife, which Salle tried to point at Asarin.
As the two men continued to grapple over the knife, they both fell to the ground near the top of the stairs and then rolled down the stairs. Asarin believed he lost consciousness for a while because the next thing he remembered was waking up at the bottom of the stairs, still clutching the knife with the blade in the air. He did not see Salle.
Asarin testified that he did not stab Salle, but that there were two occasions in which Salle could have fallen on the knife. The first was when they fell down near the top of the stairs and the second was when they tumbled down the stairs and landed on the ground floor. Asarin stated that on both occasions, he was holding the knife with the blade facing up.

DISCUSSION

I.
Asarin argues that the DPA's remarks in closing argument misstated the law regarding the affirmative defense of extreme mental or emotional disturbance (EMED). He interprets the DPA's remarks as: 1) referring to being a "law abiding" citizen or person as an element of the defense; 2) indicating that only immediate reactions would satisfy the defense; and 3) asserting that Asarin would not have qualified for the defense even if he testified that he just snapped and killed Salle after finding Salle in bed with Asarin's wife. Asarin contends the DPA's comments constituted prosecutorial misconduct and prejudiced Asarin's right to a fair trial.
Asarin did not object to the DPA's remarks at trial. We therefore review for plain error. We "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." State v. Vanstory, 91 Hawai`i 33, 42, 979 P.2d 1059, 1068 (1999) (internal quotation marks omitted).
[An appellate] court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary systemthat a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.
Id. (quoting State v. Kelekolio, 74 Haw. 479, 514-15, 849 P.2d 58, 74-75 (1993)).
"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. McGriff, 76 Hawai`i 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992). As a threshold matter, however, we must first determine whether the action of the prosecutor indeed constituted misconduct. State v Kiakona, 110 Hawai`i 450, 458, 134 P.3d 616, 624 (App. 2006). With these principles in mind, we address Asarin's claims.

II.
HRS § 707-702(2) (Supp. 2007) sets forth the affirmative defense of EMED, which, if satisfied, reduces the offense of second degree murder to manslaughter:
(2) In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.
Asarin testified that he did not stab Salle. Asarin indicated that he had no direct knowledge of how Salle had sustained the two major stab wounds to Salle's chest, and Asarin could only surmise that the wounds could have resulted from Salle's falling on the knife during their struggle. Thus, Asarin's principal defense at trial was that he did not intentionally or knowingly cause Salle's death.
The circuit court instructed the jury on the EMED defense. Asarin does not contend that the there was any error in the circuit court's instruction on the EMED defense, which provided in relevant part as follows:
There are two elements to the affirmative defense of Extreme Mental or Emotional Disturbance.
These two elements are:
One, that the defendant was, at the time he caused the death of S. T. Salle, under the influence of extreme mental or emotional disturbance; and
Two, that there is a reasonable explanation for the extreme mental or emotional disturbance.
The reasonableness of the explanation for the extreme mental or emotional disturbance shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.
The defendant must prove an affirmative defense by a preponderance of the evidence. This means that the defendant must prove that it is more likely than not, or more probable than not, that:
One, the defendant was, at the time he caused the death of S. T. Salle, under the influence of extreme mental or emotional disturbance; and
Two, that there is a reasonable explanation for the mental or emotional disturbance. In determining whether the defendant has proved the affirmative defense by a preponderance of the evidence, you must consider all of the evidence that has been presented to you regardless of who presented it.
. . . .
Extreme mental or emotional disturbance for which there is a reasonable explanation refers to a reasonably induced emotional reaction as a result of which there is a temporary loss of normal self-control and reason is overborne by intense feelings such as passion, anger, and distress, grief, excessive agitation, or other similar emotions.
The circuit court's EMED instruction correctly stated the law. HRS § 707-702(2); State v. Perez, 90 Hawai`i 65, 73-76, 976 P.2d 379, 387-90 (1999). III.

A.
Asarin claims that the DPA misstated the law in referring to a "law abiding" citizen or person in a hypothetical example the DPA gave in closing argument to illustrate a situation in which the EMED defense would apply. Asarin contends that the DPA's remarks indicated to the jury that being law-abiding was an element of the EMED defense and that Asarin had to be law-abiding to qualify for the defense. The DPA's references to "law abiding" and the context in which they were made are as follows:
That leaves you only one more thing that you're gonna have to consider in this case. And that's the [EMED] instruction on page 18 [of the written instructions distributed to each juror]. If you could all turn to that instruction, okay, because the law says in a situation like this, you know, his wife is fooling around, it's the new boyfriend, you know, the law says that even if you find the State has proved murder what would otherwise be a murder if the defense can prove to you  and, bear that in mind, he has to prove it to you, okay,  if the defense can prove to you that even though it's an intentional killing and it's murder under the law, if we can prove to you that he was under the influence of Extreme Mental or Emotional Disturbance for which there was a reasonable explanation then it's just manslaughter, okay.
I'm gonna be calling that EMED, EMED for short, what I say my further comments. So, this is what you're going to have to decide also. You cannot just stop with yeah, he's guilty of murder. He intentionally killed him. Then, you're gonna have to consider whether he's proved this defense to you, whether what is otherwise a murder becomes only manslaughter.
Lots of words here. It's difficult to understand.
You get a little bit of help, page 19 [the second page of the EMED instruction], if you can all turn to that page now, Extreme Mental or Emotional Disturbance for which there is a reasonable explanation refers to a reasonably induced extreme emotional reaction as a result of which there is a temporary loss of normal self control and reason, a person's reason, is overborne by intense feelings such as and then there's a list, okay. The first thing about this and the first thing about EMED you have to understand is it's not enough to just be real angry or real jealous or real upset or real humiliated for you to be able to prove you were under EMED. It's not enough.
If that was the case, yeah, the only murders in this country would be contract killings, okay, because except for cold contract killings every other killing, murder, I would suggest to you, involves strong emotions. You know, people don't, for example, stick knives into people because they're not very angry or very upset. So, it's not enough that they're just angry or very upset.
The State submits to you he was very angry, very upset that night. That's why he did what he did. But that's not necessarily EMED.
What I want to do, I want to give you an example of what the State submits this instruction and this defense is all about. It's just one example. There are other examples other people can come up with, okay. This is just an example that the State submits maybe can help you with your determination in this case. Maybe [Defense Counsel] will be able to come up with his own example. I don't know. Let me suggest this to you.
First of all, this is the law. Our Legislature has passed it. Basically, I would submit to you, our community, our society, has decided in certain situations what is otherwise a murder will be only a manslaughter. But, I will suggest to you further that it's supposed to be rare when that happens. And, it's in a situation where people as reasonable law abiding citizens can look at the factual scenario and say yes, he killed 'em. He shouldn't have done it. Not justifiable. But, it's reasonable. And, so we're gonna say it's not murder. It's manslaughter.
Let me give you an example. Father, he's a law abiding reasonable person and he's doing yard work in his front yard and with him in his front yard is his five year old daughter. She's playing around. She's helping daddy, basically, in the front yard, okay, and, he's working and she's playing around doing what five year olds do. And, at one point she runs into the middle of the street because she's a five year old and her father is working, he cannot keep his eyes on her the whole time. But, it so happens that when she runs out into the street, there's a car speeding down the street, as luck would have it, as bad luck would have it, going about a hundred miles per hour in a residential zone. And, this  the driver of that car hits that little girl and just wipes her out. And, the father sees this. Happens right in front of his eyes. And, the driver gets out of the car and the driver even looks a little bit drunk, okay, and, the father whose [sic] just seen his five year old daughter killed in front of his eyes by this guy in this car going a hundred miles per hour in that residential neighborhood and he snaps, okay, he snaps, he looses [sic] it. And, he grabs the shovel that he was working in the yard with and he goes up to that driver and he just starts beating 'em with the shovel, just beating him over the head. And, he kills 'em right there. He kills 'em.
It's not justifiable.
He didn't do it in self defense.
He didn't do it  you can't say he did it to defend his daughter. His daughter is already dead when he starts beating the guy.
This is not a justifiable killing. He's not insane. He knows what he's doing is wrong, but, he snaps, he snaps, and, he does it, and, he intentionally killed the guy. And, under the law, that's murder, that's murder. But, in that situation he's otherwise a reasonable law abiding person but what he saw, what happened to his daughter, okay, that causes an extreme mental or emotional disturbance and he snaps.
And, for those kinds of situations, the Legislature has said we're gonna allow that to be mitigated, lessened down, to manslaughter because reasonable people looking at that you can say yeah, he did it, he shouldn't have done it, it's murder otherwise, but, basically, we're gonna cut 'em a break because he was suffering from this Extreme Mental or Emotional Disturbance. He was reasonably induced. There's a reasonable explanation. So, it's just  it's manslaughter. No distort. It's not not guilty. He still had no right to do that to that driver. He had no right to be judge, juror, executioner.
I would suggest to you it's a far cry from this case.
(Emphases added.)
In context, it is not clear that the DPA's references to "law abiding" were an attempt to convey to the jury that unless Asarin was law-abiding, he could not qualify for the EMED defense. The DPA's first reference to "law abiding citizens" is a reference to the members of the jury, not the defendant. This reference cannot reasonably be construed as suggesting that being law-abiding was an element of the EMED defense.
The DPA twice referred to the father, the hypothetical defendant in his example, as being a law-abiding person. We conclude that these references did not have the effect of conveying to the jury that Asarin could not qualify for the EMED defense unless he was law-abiding. Presumably, Asarin would have objected if the DPA's comments were viewed as sending that message to the jury. The DPA gave a hypothetical example in which the father, who was characterized as law-abiding, qualified for the EMED defense; the DPA did not say that being law-abiding was a requirement for the EMED defense. The DPA's hypothetical example helped the jury understand the EMED defense by describing a situation that would clearly satisfy the defense.
Even if the DPA's references to "law abiding" could be construed as a misstatement of law, they did not rise to the level of plain error. Immediately prior to discussing his hypothetical, the DPA directed the jurors to look at their copies of the circuit court's instruction on the EMED defense. He even read verbatim from the portion of the instruction that defined the phrase "extreme mental or emotional disturbance for which there is a reasonable explanation." Thus, the jurors had before them the court's written instruction on the EMED defense which correctly stated the elements of the defense.
Furthermore, when the circuit court began instructing the jury on the law, it stated: "The court will instruct you now concerning the law which you must follow in arriving at your verdict." This made clear that it was the function of the court, not counsel for the parties, to instruct the jury on the applicable law. See Klinge, 92 Hawai`i at 592, 994 P.2d at 524 (stating that the jury is presumed to follow the trial court's instructions).
The only specific claim of prejudice cited by Asarin for the DPA's alleged misstatement of law is that because the jury heard that Asarin had committed adultery, the jury could have concluded that Asarin was not law-abiding and thus did not qualify for the EMED defense. But committing adultery is not illegal and the jury could not have rejected the EMED defense on that basis. Under the circumstances of this case, we conclude that any misstatement of law occasioned by the DPA's reference to "law abiding" did not prejudice Asarin's right to a fair trial or contribute to his conviction.

B.
Asarin argues that the DPA made remarks that erroneously "explained to the jury that a conviction for manslaughter due to EMED required that the Defendant react immediately to the situation causing the disturbance." As the basis for this claim, Asarin quotes the following excerpt from the DPA's closing argument:
I would suggest to you [the hypothetical example is] a far cry from this case. Yes, he found his wife in bed with another man. But, was it a big surprise?
Was it a big shock to him?
The State submits to you that's why he went over there to catch him.
Yes, he was probably very angry, humiliated, okay, because after all it's double standard. He can do it, but, not her. So, he kills S. T. Salle.
Did he snap?
Was his reason overborne?
No.
No.
That's not this case.
There's no EMED in this case such that the murder of S.T. Salle should just be manslaughter.
(Emphases added.)
We agree with Asarin that a defendant does not have to react immediately to the knowledge that his wife is having an affair for the EMED defense to apply. A time lapse "between the fatal act and the disturbance does not negate the defense." State v. Dumlao, 6 Haw. App. 173, 182 n.12, 715 P.2d 822, 829 n.12 (1986).
But the thrust of the challenged portion of the DPA's argument was that Asarin's killing of Salle was premeditated and not the result of a loss of self-control. The evidence showed that Asarin had known about his wife's affair with Salle for several months. The DPA appears to be arguing that given Asarin's knowledge of the affair, Asarin went to the apartment in the early morning on June 15, 2004, expecting to find his wife in bed with Salle and with the intent of exacting retribution. The DPA was not arguing that an immediate reaction was required as a matter of law to qualify for the EMED defense, but rather that Asarin's prior knowledge of the affair and his expectation that Salle would be at the apartment showed that Asarin was not surprised when he found Salle in Asarin's bed. This argument served to show that Asarin did not act "under the influence of extreme mental or emotional disturbance for which there [was] a reasonable explanation" when he killed Salle. The DPA's argument was based on reasonable inferences from the evidence and thus was within the permissible bounds of argument. State v. Clark, 83 Hawai`i 289, 304-05, 926 P.2d 194, 209-10 (1996).
Moreover, as previously noted, there was no objection to the DPA's remarks and the DPA directed the jury to the circuit court's EMED instruction, which correctly stated the law, during the course of his argument. Thus assuming arguendo that the DPA's remarks misstated the law concerning the need for an immediate reaction, any error did not constitute plain error.

C.
Asarin argues that the DPA made remarks that "reversed the legal consequence of a finding of EMED" and thereby confused the jury. The challenged remarks took place during the DPA's rebuttal closing as follows:
There's no self-defense in this case.
Bear this in mind. You know if you want this both on self-defense and on EMED, the defendant had taken the stand, his choice to do, and, on the EMED said to you I stabbed 'em but I was  he was  I was just grief stricken. I love my wife. She was cheating on me. This guy was sleeping with her. I found them in the bedroom. I couldn't stand it. I just snapped. I couldn't help it. I didn't want to do it.
If he said something like that, that would at least be arguable he's not guilty EMED manslaughter.
The problem though about the stabbing itself we're here because he stabbed S. T. Salle that night.
What did he tell you about that?
Did he say I stabbed him because he was coming at me and I was trying to save my life and it was a life and death struggle?
Did he say I stabbed him because I was out of my mind with grief because he's sleeping with my wife?
Did he say I stabbed him because I was trying to protect my kids?
Did he say that?
What did he say about the stabbing?
He said  this guy. I didn't do it. Maybe he fell on his knife.
You know what that is?
If you were to believe that, what that this is is an accident.
That's not self-defense.
He says he didn't even stab 'em.
That's not EMED.
He says he didn't even stab' em.
(Emphasis added.)
Asarin reads the DPA's statement, "he's not guilty EMED manslaughter," as arguing to the jury that even if Asarin testified that he snapped and killed Salle after seeing Salle in the bedroom with his wife, Asarin could not be found guilty of the lesser offense of EMED manslaughter. Asarin's construction of the DPA's statement, when viewed in the context of the argument, makes no sense.
The obvious meaning of the DPA's statement is that if Asarin had testified that he snapped and killed Salle after seeing Salle in the bedroom with Asarin's wife, Asarin could at least argue that he was "not guilty [of murder, but only of] EMED manslaughter." Our interpretation of the DPA's statement is confirmed by the DPA's subsequent argument. The point the DPA was trying to make was that Asarin's own testimony refuted the contention that he acted in self-defense or qualified for the EMED defense. In his testimony, Asarin denied stabbing Salle and suggested that Salle accidentally fell on the knife. The DPA posited that if Asarin had admitted in his testimony to stabbing Salle, then such testimony could at least arguably support a claim of self-defense or EMED. However, because Asarin testified that he did not stab Salle, Asarin's testimony did not support a claim of self-defense or EMED.
What the DPA intended to argue through his remarks was clear. We conclude that the DPA's statement did not mislead or confuse the jury.

D.
The Hawai`i Supreme Court's recent decision in State v. Espiritu,  Hawai`i , 176 P.3d 885 (2008), is distinguishable. In Espiritu, the prosecutor used a hypothetical to illustrate the EMED defense that was very similar to the one used in this case. Id. at , 176 P.3d at 899-900. As part of the hypothetical, the prosecutor referred to the special relationship between the hypothetical father and the child struck by the drunk driver and the father's immediate reaction in retaliating against the drunk driver. Id. Espiritu promptly objected to the prosecutor's reference to the special relationship and also to the prosecutor's reference to the immediate reaction, asserting on both occasions that the prosecutor was misstating the law with respect to the EMED defense. Id. at , 176 P.3d at 899. The trial court overruled Espiritu's objections and allowed the prosecutor to proceed with his argument. Id.
The Hawai`i Supreme Court vacated the Espiritu's attempted murder conviction, concluding that the prosecutor's argument misstated the law by "plac[ing] on [Espiritu] the burden of proving a special relationship between the Complainant and [Espiritu] and an immediacy in the event that the law did not require." Id. at , 176 P.3d at 900-01. Critical to the court's decision was the stamp of approval the circuit court had given to the prosecutor's misstatement of the law by overruling the defendant's objections:
The jury was not disabused of [the prosecutor's misstatement of the law]. Because [Espiritu's] counsel's objections to these arguments were overruled, the jury would reasonably perceive that the misstatement of the law was not incorrect.
Id. at , 176 P.3d at 901.
Unlike in Espiritu, Asarin did not object to the DPA's remarks in this case. Accordingly, the circuit court did not overrule any defense objection in a way that would highlight the DPA's remarks and cause the jury to reasonably perceive that any misstatement of law made by the DPA was required for the EMED defense. Instead, the jury was directed by the DPA to the circuit court's EMED instruction, which the court had told the jury was the law the jury was required to follow. The EMED instruction correctly stated the law. The DPA's challenged remarks did not mislead the jury or prejudice Asarin's right to a fair trial.
In Espiritu, the prosecutor emphasized in his argument that the absence of the special relationship and immediate reaction referred to in the hypothetical showed that Espiritu did not qualify for the EMED defense. Id. at , 176 P.3d at 903. Here, the DPA did not argue that Asarin failed to qualify for the EMED defense because Asarin was not law-abiding. The DPA also did not contend that Asarin failed to act immediately upon discovering Salle in the bedroom with Asarin's wife. Indeed, Asarin killed Salle within a short time after discovering them in the bedroom, and the DPA indicated that Asarin could arguably have proven the EMED defense if Asarin had admitted to stabbing Salle in reaction to seeing Salle in the bedroom with Asarin's wife. These are additional differences that further distinguish Asarin's case from Esprirtu. We conclude that Espiritu does not control the decision in this case.

CONCLUSION
We affirm the December 28, 2005, Judgment of the Circuit Court of the First Circuit.
NOTES
[1] The Honorable Richard K. Perkins presided.
[2] Hawaii Revised Statutes (HRS) § 707-701.5 (1993) provides, in relevant part, as follows:

§ 707-701.5 Murder in the second degree. (1) Except as provided in section 707-701 [(Murder in the first degree)], a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.